1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3      Case No. 15-mj-01012-KMT

4      _____

5      UNITED STATES OF AMERICA,

6            Plaintiff,

7      vs.

8      ANDREW JOHN GIBSON,

9            Defendant.

10     _____

11            Proceedings before MICHAEL E. HEGARTY, United

12     States Magistrate Judge, United States District Court for the

13     District of Colorado, commencing at 10:17 a.m., February 10,

14     2015, in the United States Courthouse, Denver, Colorado.

15     _____

16            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17     ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18     _____

19                      APPEARANCES

20            MARTHA A. PALUCH, Assistant United States

21     Attorney, appearing for the government.

22            WARREN R. WILLIAMSON and DAVID JOHNSON, Assistant

23     Federal Public Defenders, appearing for the defendant.

24     _____

25              PRELIMINARY/IDENTITY/DETENTION HEARING

```
 1                     P R O C E E D I N G S

 2            (Whereupon, the within electronically recorded

 3      proceedings are herein transcribed, pursuant to order of

 4      counsel.)

 5            (Whereupon, the speakers are often speaking into

 6      the same microphone; therefore, there are instances of

 7      inaudible text.)

 8            THE COURT:  Okay.  We're on Case Number

 9      15-mj-01012, United States of America versus Andrew John

10      Gibson.  For the United States, please.

11            MS. PALUCH:  Good morning, Your Honor.  Martha

12      Paluch appearing on behalf of the United States.

13            THE COURT:  Thank you.  Good morning.

14            MR. WILLIAMSON:  Good morning, Your Honor, Warren

15      Williamson and David Johnson of the office of the Federal

16      Public Defender here on behalf of Mr. Gibson.  He's present

17      in custody.  I was wondering if it's part of Your Honor's

18      protocol to allow the defendant to sit at counsel table.

19            THE COURT:  I don't mind that at all.  That's up

20      to the Marshals who might --

21            MR. WILLIAMSON:  If it's okay with the Marshals

22      could we do that if possible?

23            MS. PALUCH:  That is fine.

24            MR. WILLIAMSON:  Thank you.

25            THE COURT:  I would think that's preferable except
```

```
 1    when there's any kind of security issue.

 2              MR. WILLIAMSON:  Right.  I agree with that.  Thank

 3    you.

 4              THE COURT:  Do you need some time?

 5              MR. WILLIAMSON:  No.  We're ready.  Thank you.

 6              MS. PALUCH:  Can you just (inaudible).

 7              MR. WILLIAMSON:  Oh, no.  I don't -- I don't even

 8    think that's an issue, but if it were -- is we aren't.

 9              MS. PALUCH:  Okay.  Thank you.

10              THE COURT:  So I have it set for a preliminary ID

11    and detention from Nevada.  Where are we now on all three of

12    those?

13              MS. PALUCH:  I believe Mr. Williamson said that

14    he's not contesting identity --

15              THE COURT:  Okay.

16              MS. PALUCH:  -- so it will be preliminary hearing

17    and detention, Your Honor.

18              THE COURT:  Do we use the filed form to some

19    extent when you're waiving something?

20              MR. WILLIAMSON:  You know, I don't know the answer

21    to that.  It came up yesterday.  We're happy to sign any

22    form, but this is really under Rule 40.

23              THE COURT:  Okay.

24              MR. WILLIAMSON:  So we'll just stipulate to

25    identity if that's --
```

 1              THE COURT:  That will be fine.  Yes.

 2              MR. WILLIAMSON:  Okay.  Thank you.

 3              THE COURT:  You don't need me to (inaudible), Miss

 4     Paluch?

 5              MS. PALUCH:  I do not, Your Honor.

 6              THE COURT:  All right.

 7              MS. PALUCH:  Your Honor, I have with me a copy of

 8     the defendant's appearance bond issued out of the District of

 9     Nevada as well as the docket sheet if the Court would be

10     interested in seeing those documents.

11              THE COURT:  Thank you.  Yes.

12              MS. PALUCH:  May I approach?

13              THE COURT:  Defendant -- Mr. Williamson's docket

14     sheet (inaudible) --

15              MS. PALUCH:  Yes.

16              THE COURT:  -- (inaudible) docket sheet today.

17              MS. PALUCH:  (Inaudible), so (inaudible).

18              MR. WILLIAMSON:  And I have -- government's

19     counsel has provided me with both of those documents.

20              THE COURT:  Okay.

21              MS. PALUCH:  Your Honor, I have two witnesses this

22     morning.  One is a probation officer here, Carlos Morales.

23     And I have another -- the pretrial services officer who is

24     located in Nevada and I ask permission that she be allowed to

25     testify by -- testify by telephone today.

1            THE COURT:  That's fine.

2            MS. PALUCH:  So at this point the government will

3    call Senior Probation Officer Carlos -- Carlos Morales.

4            THE COURT:  Okay.  Mr. Morales, please come

5    forward.

6            UNIDENTIFIED SPEAKER:  Please raise your right

7    hand.

8        CARLOS MORALES, GOVERNMENT'S WITNESS, SWORN

9            MS. PALUCH:  Judge, do you want a copy of his

10   pretrial service report?

11           THE WITNESS:  It's the original one that was done.

12           THE COURT:  Is it on the drive?

13           THE WITNESS:  It may be on the drive.

14           THE COURT:  What year?

15           THE WITNESS:  It would have been October 2014.

16           THE COURT:  No.  I don't have -- yes, I do.  I

17   have it electronically if it's -- is this the same thing?

18           THE WITNESS:  Yes.  It should be the driver

19   (inaudible) originally.

20           THE COURT:  Yeah.

21           THE WITNESS:  (Inaudible).

22           THE COURT:  Proceed when you're ready.

23           MS. PALUCH:  Thank you, Your Honor.

24                    DIRECT EXAMINATION

25   BY MS. PALUCH:

```
 1      Q      Good morning, sir.

 2      A      Good morning.

 3      Q      Can you please state your name?

 4      A      Carlos Morales.

 5      Q      And how are you employed?

 6      A      I'm a Senior US Probation Officer.

 7      Q      And how long have you held that position?

 8      A      Approximately 13 years.

 9      Q      And during the course of your employment have you had

10      occasion to supervise an individual by the name of Andrew

11      John Gibson?

12      A      Yes.

13      Q      And when did you first start supervising this

14      individual, Mr. Gibson?

15      A      Mr. Gibson I believe was released from custody on

16      October 30th, but I became involved in the case before that.

17      Q      Was he originally arrested in Colorado?

18      A      I believe so.

19      Q      Correct.  So can you describe the nature of your

20      supervision since October to -- up until the present?

21      A      I've dealt with Mr. Gibson frequently from then on

22      speaking about all of his conditions that he has to abide by

23      and also him going back to Las Vegas for his -- where his

24      charges originate from.  Yeah.

25      Q      So Mr. Gibson resides here in Colorado?
```

```
 1      A     Yes.

 2      Q     And he's been charged in Nevada?

 3      A     Yes.

 4      Q     And so he has Court appearances to appear there in

 5   Nevada, correct?

 6      A     Correct.

 7      Q     And you mentioned the conditions of his release.  He

 8   was granted pretrial release on a personal recognizance bond;

 9   is that correct?

10      A     I believe so.  Yes.

11      Q     Right.  And did you -- you mentioned the conditions of

12   his release.  Did you discuss with him the conditions of his

13   release?

14      A     Yes.

15      Q     And did you discuss the importance of him abiding by

16   all of those conditions?

17      A     Yes.

18      Q     Okay.  I'd like to take you through some of your

19   interactions with Mr. Gibson.  Can you describe -- first of

20   all, on a weekly basis can you describe if you can how often

21   you would speak with Mr. Gibson?

22      A     Oh, I would say at least two to three times a week I

23   would speak with Mr. Gibson.

24      Q     Okay.

25            THE COURT:  Could I ask a question?  Is this
```

1    another courtesy supervision that you guys were doing?

2              THE WITNESS:  Yes.  So what happened is he was

3    arrested here on the charges, oh, excuse me, went back to Las

4    Vegas to -- to answer those charges and he was released on

5    bond up there.

6              THE COURT:  That's where he got the conditions is

7    from Nevada?

8              THE WITNESS:  The new conditions from Nevada.  It

9    was original conditions here and then he got new conditions

10   in Nevada.

11             THE COURT:  Which supersede our conditions?

12             THE WITNESS:  Correct.

13             THE COURT:  Okay.  So the conditions we're dealing

14   with are Nevada's conditions?

15             THE WITNESS:  Now Nevada's conditions, correct.

16             THE COURT:  And yesterday it was described as a

17   90-day courtesy supervision.  Is that what this is, a 90-day?

18             THE WITNESS:  No, Your Honor.  It's until the

19   pending charges are resolved or --

20             THE COURT:  Okay.  So what's the difference

21   between a 90-day and until charges are resolved?  How do you

22   guys approach either of those situations?

23             THE WITNESS:  Well, in this case, Your Honor, he

24   was released on bond with -- with new conditions from Las

25   Vegas and he resides in Colorado.  They request courtesy

1    supervision from us to enforce those conditions, and if there

2    are any issues with those we contact Las Vegas about those,

3    you know, any violations or issues that come up, and that

4    typically just goes throughout the whole pretrial process.

5              THE COURT:  There?

6              THE WITNESS:  Well --

7              THE COURT:  I mean, if he's charged with a

8    violation of Nevada's conditions does he go over to answer

9    for those in Nevada?

10             THE WITNESS:  Yes.  I mean, in this case he was --

11   he -- we've alleged there's issues with -- with the

12   conditions and we're having a detention hearing.  I would

13   assume that he -- that those conditions get answered in

14   Nevada.  Yeah.

15             THE COURT:  Okay.  And so we -- the -- this -- I

16   forget what her name was yesterday, but she called it a

17   90-day courtesy supervision.  Is that -- is that just an old

18   term people used and it really is just you're supervising

19   until you're asked not to supervise anymore?

20             THE WITNESS:  Correct, Your Honor.

21             THE COURT:  Go ahead.

22             THE WITNESS:  I don't know if there's -- 90 days

23   is a separate thing from another district, but --

24             THE COURT:  All right.

25             THE WITNESS:  -- it's -- yeah.

1          MS. PALUCH:  Okay.  And just to set the stage,

2    Your Honor, my understanding is -- what we're addressing here

3    is whether or not the defendant should be returned --

4          THE COURT:  Right.

5          MS. PALUCH:  -- to Nevada in custody or not to

6    answer the charges and the arrest warrant that's been issued

7    there alleging that he's violated the conditions.

8          THE COURT:  Right.  But our -- are we also doing

9    probable cause?

10         MS. PALUCH:  Well, and that's not all -- all that

11   clear to me, but the witnesses that I'll be presenting will I

12   believe demonstrate that.

13         THE COURT:  Okay.  Go ahead.

14   Q    (BY MS. PALUCH) So in the -- you mentioned that you

15   would -- had conversations with Mr. Gibson two to three

16   times.  Is that what you said, three times a week?

17   A    I would say at least, sometimes more, potentially

18   sometimes less than that, but quite frequent contact with

19   Mr. Gibson throughout his term -- throughout his supervision.

20   Q    Okay.  And during those conversations did the issue of

21   Mr. Gibson contemplating suicide ever arise?

22   A    Yes.

23   Q    Can you please state for the Court the nature of those

24   conversations and what was said to you?

25   A    Well, you know, on occasions I've had concerns about

1      Mr. Gibson potentially contemplating suicide.  He's mentioned

2      -- he'd make comments about regretting that he didn't commit

3      suicide previously.  He's made comments that he's had plan --

4      had a plan for suicide potentially insinuating that -- that

5      -- well, on one occasion he made a comment where he -- he had

6      a plan that he would commit suicide in Court.  We had -- I

7      spoke to his -- to his counselor also about those comments

8      that he'd made and --

9              MR. WILLIAMSON:  Could we possibly have the

10     identification of who his counselor is?  Thank you.

11             MS. PALUCH:  Certainly.

12     Q     (BY MS. PALUCH) So let's -- let's go back a bit.

13     A     Yeah.

14     Q     You indicated that during some of your conversations

15     the defendant did indicate -- express statements regarding

16     suicide, his thoughts of suicide?

17     A     Right.

18     Q     And what action did you take or -- if any, when the

19     defendant would make these statements to you?

20     A     Well, on one occasion I, you know, discussed it by

21     supervisor.  At some point I ended up talking to the

22     probation office in Las Vegas about these comments that he's

23     -- has been made.

24     Q     I'm going to stop you there.  So -- and so who did you

25     speak with in Las Vegas?

1   A    His probation officer out there who's assigned to his

2   case.  It's a Senior USPO Sandra Bustos.

3   Q    Okay.  All right.  And then you said his counselor.

4   Who -- do you know the name of his counselor that you spoke

5   with?

6   A    He has -- he's been going to mental health counseling

7   here with the services that we contract with and his name is

8   Vincent Cobb -- or Vince Cobb.

9   Q    Okay.  And you've spoken to him about statements made

10  by the defendant?

11  A    Right.

12  Q    In one of the statements that you made before we

13  stopped here is that the defendant indicated he had --

14  expressed to you a desire to possibly commit suicide in the

15  Court?

16  A    On one conversation I did have a talk with him.  He

17  made comments about that.  Yeah.

18  Q    Okay.  I'm going to take you to a conversation on

19  January 26.  Do you recall having a conversation regarding

20  the defendant on January 26?

21  A    Yes.

22  Q    And who was all involved in that conversation?

23  A    Well, this was -- well, we had several conversations

24  that day.  There was a conversation earlier in the day that

25  was a conference call between a lot of different people.  It

1    was myself, his probation officer in Las Vegas, Mr. Gibson,

2    my supervisor, James Murphy, and USPO Bustos' supervisor.

3    Her name is Erin.  I don't remember her last name.  Yeah.

4    Q    And what was the purpose of that conference call on

5    January 26th?

6    A    It was pretty much to address issues that we've been

7    working with with Mr. Gibson regarding what's going to be

8    required of him with a possible employment at Auto Zone, also

9    maybe allowing some -- some more liberties.  Mr. --

10   Mr. Gibson wanted to walk his dog one day a week which is

11   sometimes difficult with the -- with the GPS monitoring.  And

12   we came up with a solution to that where we would authorize

13   him to go out with his -- another counselor that he has

14   walking in the community and then he could have the

15   opportunity to walk his dog during that time.  And also we

16   spoke about comments that he's made regarding suicide so

17   everyone was on the same page.

18   Q    And I'm going to stop you there.  So the -- the

19   solution that you came up to -- came up with was to allow him

20   to walk his dog with his counselor so he could be talking to

21   his counselor while he was walking the dog.  Is that -- did I

22   understand you correctly?

23   A    Yeah.  Well, that was something that was -- that --

24   that he had been asking for for a while to be allowed to do.

25   And one of those -- I guess allowing him to do that could

1    potentially help alleviate some of the frustrations that he's

2    had.  Yeah.

3    Q    And when you say frustrations that he's had, what --

4    what is the source of the frustrations --

5    A    Oh --

6    Q    -- primarily?

7    A    -- primarily all of the restrictions and conditions

8    that he has to abide by on bond supervision.

9    Q    And during your interaction with him what has been his

10   reaction to those conditions of his pretrial release?

11   A    Can you repeat the question?

12   Q    Yes.  What is his -- what is his -- has he stated his

13   feelings to you about the conditions of his pretrial release?

14   A    Yeah.  I mean, he stated that he's very frustrated with

15   them, that he doesn't -- on occasion he said that he doesn't

16   want to abide by them.  He said that they're infringing on

17   his rights.  They're -- yeah, lots of frustration with it,

18   with the conditions, and having to deal with all of the

19   restrictions that are placed on him.

20   Q    Okay.  Now, that was the conference call that you just

21   described for the Court on the 26th.  I'd like to take you to

22   -- did you have any discussions with the defendant after that

23   conference call?

24   A    Yeah.  I had -- I had a -- I had a talk with Mr. Gibson

25   following that conference call.  Yes.

1    Q      And what was the nature of that conversation?

2           MR. WILLIAMSON:  May we have a date, please?

3    A      That was on the 26th as well.

4    Q      (BY MS. PALUCH) It was after the conference call.  So

5    after the conference call you had an individual call with

6    Mr. Gibson; is that correct?

7    A      Right.  Right.

8    Q      Can you describe the nature of that conversation?

9    A      I just wanted to rehash some of the stuff.  Mr. --

10   Mr. Gibson was frustrated with some of the -- the discussion

11   on the prior conference call and we just, you know, wanted to

12   rehash things with him and calm him down a little.  And --

13   but he expressed during that call -- let's see.  He indicated

14   that he didn't -- let's see.  That he -- during that call --

15          MR. WILLIAMSON:  I think the record should reflect

16   that the witness appears to be reading something which I'll

17   inquire into later.

18          THE COURT:  It will.  Yes.  If you -- Mr. Morales,

19   you can't recall what you talked about --

20          THE WITNESS:  Yeah.  No.  I can recall.  I can --

21   I was looking at my notes.  I mean, I can -- I can close this

22   if you'd like.

23          THE COURT:  No.  You can look at it.  The record

24   just always needs to be clear that either you're responding

25   with memory --

 1              THE WITNESS:  Oh, sure.  Okay.

 2              THE COUR:  -- or you're responding from your

 3    notes.  So that's fair.  That's a fair request.

 4              THE WITNESS:  Okay.  No.  No.  Sure.

 5    Q    (BY MS. PALUCH) Let me ask this preliminary question,

 6    Officer Morales.  When you supervise an individual do you

 7    take notes about your conversations with them so that you can

 8    adequately recall?  Is that --

 9    A    Typically, yes, yes.

10    Q    Okay.  And have you done that in this case?

11    A    Yes.

12    Q    Okay.  And did you take notes of your conversation with

13    the -- with Mr. Gibson on January 26th?

14    A    Yes.

15    Q    Would you like to refer to those notes?

16    A    I can.

17    Q    Yes.  If that would refresh your recollection please do

18    so.

19    A    Okay.

20    Q    And then if you can just testify from having been

21    refreshed.

22    A    One of my notes, it said he indicated that he -- Mr. --

23    Mr. Gibson made a comment indicating that he would slit his

24    throat or his neck in Court before going to jail.  He's made

25    comments about not wanting to -- he was adamant about not

1    going to jail and said he would potentially commit suicide

2    before -- before that occurring.  He didn't want -- he said

3    that he didn't want to break his bond because he didn't -- he

4    wanted to follow his plan to -- to commit suicide.  He was

5    very frustrated.  And he on occasion goes on rants and kind

6    of -- about the frustrations he has with the conditions of

7    bond and the restrictions that he's under.

8    Q    Thank you.  I'd like to take you to a conversation that

9    occurred on February 2nd of this year.  Do you recall that

10   conversation just last Monday?

11   A    Yes, Your Honor -- I mean, yes.

12   Q    Yes.  Certainly.  And who all was on that conference

13   call?

14   A    It was a conference call between Mr. Gibson, myself,

15   and Officer Sandra Bustos in Las Vegas.

16   Q    And she's the pretrial services officer out in Nevada?

17   A    Yes.

18   Q    Okay.  And what was the purpose of that conference

19   call?

20   A    It was to get everything in order regarding what was

21   going to be required from Mr. Gibson regarding his new

22   employment.

23   Q    And where was his new employment proposed to be?

24   A    It was going to be at Auto Zone.

25   Q    Auto Zone.  Okay.  And so what were you attempting to

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

1    accomplish in the conference call?

2    A    Well, part of his restrictions with his bond require

3    that he not have any access to the internet.  So on -- with

4    specific employment we have to make sure that -- what his

5    access to the internet is going to be at the location of

6    where he's going to be working.  So we're trying to figure

7    out what would be the best way to get that information

8    without potentially not notifying them of the charges and

9    what -- how those fall into the conditions of bond from

10   Nevada.

11   Q    Okay.  And is the restriction on his use of the

12   internet a result of the charge that he's facing in Nevada?

13   A    Yes.

14   Q    Okay.  So during this conference call explain to me --

15   I think you just did; that that was the purpose of the call,

16   correct?

17   A    Yes.

18   Q    And can you explain how that conversation progressed

19   which brings us here to Court today?

20   A    Well, Mr. Gibson had gone to meet with the folks over

21   at Auto Zone requiring -- to see what he was going to be

22   doing for them as far as employment and we talked about -- we

23   talked about him -- if he was going to -- having to sign some

24   sort of agreement with Auto Zone, what -- what his position

25   would -- would entail regarding his access to the internet

```
 1    there, and he was saying that he would not have access to the
 2    internet, that there would be only access at the front desk
 3    computers, but it was sort of a closed internet, that he
 4    didn't have access to the outside internet outside of the
 5    Auto Zone web site.  And we were -- he indicated that he had
 6    to do some testing on occasion on the computers there.  And
 7    he wasn't sure at this time if his employment at Auto Zone
 8    would be as a truck driver or as a front desk person there.
 9    And then we inquired if he was going to be given, like, a
10    phone that had internet access potentially at Auto Zone for
11    truck -- for delivering parts, that type of thing.  And at
12    that point, you know, Mr. -- Mr. Gibson became very
13    frustrated and went onto one of his rants that -- you know,
14    saying that his rights are being infringed upon, that -- you
15    know, he had -- insinuating that he, you know, was not going
16    to go to jail and that if someone came to arrest him that --
17    that he would be ready to defend himself, that type of thing.
18    And then Miss Bustos asked him if that was a threat and he
19    indicated it wasn't and that -- but he was insinuating
20    possible -- hurting himself or violence if he were to be
21    arrested.
22    Q     Okay.  And during that conversation did he indicate
23    whether he intended to continue to comply or to comply with
24    the conditions of his release?
25    A     He had made similar comments before where --
```

```
 1    Q    I'm just taking you to February 2nd.

 2    A    Yes.

 3    Q    During that conversation did he discuss the --

 4    A    Yes, he did.  He said that he would -- he would --

 5    during the conversation he said that he would take -- would

 6    want to not follow any of the conditions of his bond, but he

 7    would keep the GPS unit on; that we can monitor him in the

 8    community with just the GPS tracker on without him having to

 9    follow any other conditions, that he was frustrated with the

10    restrictions that he was under.

11    Q    Okay.  So you indicate -- you stated that the

12    defendant, Mr. Gibson, said that he would be prepared if

13    anyone came to his home to arrest him.  Is that what you

14    stated?

15    A    Yes.

16    Q    And did you perceive that as a threat?

17    A    I perceived that as potentially a threat.  Yeah.  I

18    mean, definitely a safety concern for -- potentially for

19    officers if they were going to arrest him.  Yes.

20    Q    Mm-hmm.  And did you understand this conversation also

21    indicating, again, once again his intent to -- or desire to

22    commit suicide?

23    A    Repeat that.  Excuse me.

24    Q    During that conversation did he reference again his

25    intent or his desire to commit suicide?
```

1    A    I believe so.  He said -- and his regret for not

2    committing suicide in the past.  Yeah.

3              MS. PALUCH:  At this point I have no further

4    questions, Your Honor.

5              THE COURT:  Mr. Morales, what time was the phone

6    call?

7              THE WITNESS:  The phone call -- can I refer to my

8    notes regarding that -- the phone call?

9              THE COURT:  Yes.

10             THE WITNESS:  It was approximately at 1:44 in the

11   afternoon.

12             THE COURT:  Was any direct physical contact made

13   with him that day?

14             THE WITNESS:  No, Your Honor.

15             THE COURT:  Or the next day?

16             THE WITNESS:  Not the next day, no.

17             THE COURT:  Go ahead, Mr. Williamson.

18             MR. WILLIAMSON:  Thank you.

19                        CROSS-EXAMINATION

20   BY MR. WILLIAMSON:

21   Q    Mr. Morales, I'd like to start with the concept of

22   frustration if I could.  You've talked about that.

23   A    Sure.

24             MR. WILLIAMSON:  And related to that, although I'm

25   not saying I'm frustrated, since you have referred to your

1    notes today as the judge has established and counsel for the

2    government has established in testifying, I would

3    respectfully ask the Court to have the witness provide me

4    with the notes of the relevant dates to which he referred

5    before testifying.

6              THE COURT:  Any objection?

7              MS. PALUCH:  Yes, Your Honor.  I don't believe

8    that's appropriate.

9              THE COURT:  Why?

10             MS. PALUCH:  I believe that the witness can

11   refresh his recollection of his notes, but I don't believe

12   that his notes are, therefore, subject to disclosure.

13             THE COURT:  Why?  Are they privileged in any way?

14             MS. PALUCH:  You know, I just don't believe it's

15   standard practice when the witness refreshes his recollection

16   that he then provides those notes over.

17             THE COURT:  Well, in my experience it is standard

18   practice.

19             MR. WILLIAMSON:  Exactly.

20             THE COURT:  If he looks up something and testifies

21   and even reads directly off that document then the opposing

22   party is entitled to look at it if only for the reason of

23   impeachment to see if he's reading it correctly.  So I'll

24   allow you to look at the notes.

25             MR. WILLIAMSON:  Thank you.

```
 1                THE COURT:  Do you need some time when I'm off the
 2      bench?  Maybe we should go off the bench while you --
 3                MR. WILLIAMSON:  Actually I'd just like him to
 4      give me the notes and then we can move on from there with
 5      Your Honor's permission.
 6                THE COURT:  Okay.
 7                MR. WILLIAMSON:  If I need a little time to study
 8      them --
 9                THE COURT:  Very good.
10                MR. WILLIAMSON:  -- I'll ask (inaudible).
11                THE COURT:  Mr. Morales, just the notes you were
12      looking at while you were testifying, okay --
13                THE WITNESS:  Okay.
14                THE COURT:  -- of the one conversation.
15                THE WITNESS:  About the conversation on the 26th?
16                THE COURT:  Well, both.  There was the 26th and
17      the 2nd.
18                THE WITNESS:  Okay.
19                MR. WILLIAMSON:  You don't have to deliver them.
20                THE WITNESS:  Yeah.  I can deliver.
21                MR. WILLIAMSON:  (Inaudible).
22                THE WITNESS:  You know, Your Honor, on -- on the
23      one handwritten note there might be some information about
24      other -- another defendant -- or another case.
25                THE COURT:  Will you give him some tape?  Do you
```

1    have some tape there that you can use?

2           MR. WILLIAMSON:  Or I'll promise not to look at it

3    or whatever you (inaudible).

4           THE COURT:  Well, just --

5           THE WITNESS:  I don't know if that's --

6           THE COURT:  Do we have any white tape?

7           THE CLERK:  Whiteout (inaudible).

8           THE COURT:  Not -- just to place it over it, just

9    a piece of redaction tape.

10          MR. WILLIAMSON:  Carlos, with Your Honor's

11   permission, you can tape over that, the things that you don't

12   want us to see.

13          THE COURT:  Yeah.  That's fine.

14          THE CLERK:  (Inaudible).

15          THE WITNESS:  Sure.  We've got some -- we've got

16   some sticky -- yeah.  That's fine.  I mean --

17          THE COURT:  Very good.

18          MR. WILLIAMSON:  All right.  However that works.

19          THE COURT:  Tear it up and cover up whatever you

20   (inaudible).

21          THE WITNESS:  Okay.  Okay.

22          MR. WILLIAMSON:  Is that agreeable to the Court

23   (inaudible)?  Thank you.

24          THE COURT:  And I'll trust you not to peek

25   underneath.

1          MR. WILLIAMSON:  I have enough to do I'm not

2     looking for trouble.

3          THE WITNESS:  As long as you don't peek.

4          MR. WILLIAMSON:  (Inaudible).  I promise.  I

5     promise.

6          THE COURT:  You take your time.  Are you sure you

7     have marked everything, Mr. Morales?

8          THE WITNESS:  Yeah.  I think that's fine.

9          THE COURT:  Thank you.

10          MR. WILLIAMSON:  Thank you, Your Honor.  Thank

11     you, Mr. Morales.

12     Q    (BY MR. WILLIAMSON) Back to frustration.  Let me take

13     us back in time even before Mr. Gibson was first released in

14     this district on the Nevada indictment which is pending

15     there.  Were you aware as part of your work with pretrial

16     services that long before the indictment was returned in

17     Nevada Mr. Gibson was contacted in Nevada by agents of the

18     Federal Bureau of Investigation investigating what became the

19     charges there?  Did you know that?

20     A    Mr. Gibson has made comments about that that he had

21     been -- yes.

22     Q    Then Mr. Gibson was later arrested here in the District

23     of Colorado on the Nevada indictment.  Yes?

24     A    Yes.

25     Q    And he'd returned to live in Colorado.  Yes?

1     A     Yes.

2     Q     Before I go any further you've had contact with some --

3     I'll call them important people in Mr. Gibson's life as part

4     of your responsibility and duties, be it in person or over

5     the phone; isn't that true?

6     A     Sure.

7     Q     And that would include John Gibson.  Yes?

8     A     Yes.

9     Q     You pointed at somebody.  Would you stand, Mr. John

10    Gibson, please?

11    A     Yes.

12    Q     And would you tell the Court who John Gibson is?

13    A     John Gibson is the defendant's father.  I've spoken to

14    him on occasion.  I met him once before.

15    Q     Right.  You may be seated, sir.  Thank you.  How about

16    Eileen Huff (phonetics)?

17    A     I have not had any contact with Eileen Huff.

18    Q     Oh, I'll proffer that Miss Huff is Mr. Gibson's wife

19    and my client's stepmother.  Miss Huff, would you please

20    stand?

21    A     Thank you.

22          THE COURT:  Thank you.

23    Q     (BY MR. WILLIAMSON) Finally, had -- you had contact

24    with a Mr. Stuart Watkins?

25    A     Yes.

1    Q    And what is your understanding of Mr. Watkins'

2    relationship to Mr. Gibson, if any?

3    A    Mr. Watkins is somewhat of a counselor to Mr. Gibson.

4    He's a life coach that meets with Mr. Gibson I think it's

5    once a week, but, you know, pretty often.

6    Q    And you've actually personally spoken with Mr. Watkins?

7    A    Yes.  He came to -- he came to the -- to the first

8    meeting with Mr. Gibson.

9    Q    And Mr. Watkins, would you please stand, sir?  Is that

10   Stuart Watkins?

11   A    Yes, it is.

12   Q    Thank you.  You may be seated.  Now, Mr. Watkins is not

13   working under the auspices or direction of the US Probation

14   Department.  This is a private relationship, yes?

15   A    Yes, it is.

16   Q    And Mr. Gibson is also seeing under the auspices of the

17   US Probation Office a counselor by the name of Vince.  What

18   was his last name?

19   A    Cobb.

20   Q    Cobb?

21   A    Cobb, yeah.

22   Q    C-o-b-b?

23   A    Correct.

24   Q    Now, Mr. Cobb works through or -- and I always get this

25   mixed up so you can sort me out.

1    A    Mm-hmm.

2    Q    Through or with Independence House as -- to provide

3    counseling to people who are on probation, supervised release

4    or pretrial release, true?

5    A    Correct.  Yes.

6    Q    And Mr. Cobb works -- when he sees Mr. Gibson he's

7    working out of a facility called Independence House North,

8    yes?

9    A    Yes.

10    Q    And that's some place in the greater Denver area,

11    right?

12    A    Yes, it is.

13    Q    And how often has Mr. Gibson been visiting with

14    Mr. Cobb, the counselor?

15    A    He's been going twice a week.

16    Q    All right.  And has he missed any of those

17    appointments?

18    A    No, he hasn't.

19    Q    And this counselor through Independence House North is

20    working directly with Mr. Gibson under the authority of the

21    US Probation Department, yes?

22    A    I'd like to go back to that previous question.  I think

23    he had missed a counseling appointment, but it was because of

24    a schedule thing that we didn't -- that we didn't enter so he

25    didn't -- he decided not to go to it because his schedule

```
 1    wasn't in place for his GPS monitoring.
 2    Q     Oh, so there is all these logistics because you have
 3    GPS monitoring, right?
 4    A     Right.  Right.
 5    Q     And Mr. Gibson is essentially confined to his home, but
 6    with permitted -- with times and places where he's permitted
 7    to go under your direction, yes?
 8    A     Correct.  Yes.
 9    Q     And so there were some I'll call it logistical issues
10    that needed --
11    A     Yes.
12    Q     -- to be sorted out?
13    A     Yes.
14    Q     Understood.  Now, the reason that Vince Cobb is
15    associated with this case is because there are conditions,
16    specific conditions set by the Magistrate Judge in Las Vegas
17    regarding mental health counseling; isn't that true?
18    A     I believe so.
19    Q     Well, otherwise --
20    A     Yes.  (Inaudible).  I can look at the conditions and
21    refer to them.
22    Q     All right.  But there has to be some -- some legal
23    basis for you guys to provide the service, yes?
24    A     Yes.
25    Q     All right.  And this is mental health counseling, true?
```

1    A    Yes.

2    Q    Among other things, did you become aware that

3    Mr. Gibson himself besides working with Stuart Watkins has an

4    M.D., a physician who is involved with his ongoing treatment?

5    A    Yes.

6    Q    And that to be Brian Wise, M.D. here in Colorado?

7    A    Correct.  I know him as Dr. Wise.  I don't (inaudible).

8    Q    Dr. Wise.  And you were aware also that there had been

9    some medications prescribed for Mr. Gibson as part of his

10   treatment, yes?

11   A    Yes.

12   Q    And it is my understanding that you have also been

13   advised that there had been a diagnosis or possible diagnosis

14   that Mr. Gibson suffers from Asperger's syndrome?

15   A    Yes.  References to that have been made by Mr. Gibson.

16   Yes.

17   Q    And are you familiar with the fact that one of the --

18   not the only, but one of the many symptoms of Asperger's

19   syndrome are -- well, I think as you described them, rants or

20   outbursts?

21   A    I'm not an expert on Asperger's so I wouldn't know if

22   that's an actual syndrome of Asperger's.

23   Q    It might help in counseling Mr. Gibson if you

24   acquainted yourself with some of those possibilities.  The --

25   now, let's talk about Mr. Gibson and his frustrations because

1    you've referred to him being frustrated about the conditions

2    of having to comply with conditions of supervised release.

3    A    Right.

4    Q    And we have been and the Court has been provided with a

5    document from the District of Nevada which you may or may not

6    have in front of you.

7    A    I do have one (inaudible).

8    Q    Okay.  Which sets the conditions of release?

9    A    Correct.

10    Q    And there's a number of them in there and I'm not going

11    to go through one by one, but let's -- let's select a few

12    that may be important.  Among other things, he's supposed to

13    appear in Court when he's required to do so.  That is in

14    Nevada, yes?

15    A    Yes.

16    Q    And he has a Court date set in Nevada.  He's not missed

17    any Court dates there, has he?

18    A    He has not.  No.

19    Q    He is required to stay in contact with you as his

20    pretrial services officer, yes?

21    A    Yes.

22    Q    Yes?

23    A    Yes, he is.

24    Q    And he's done that, hasn't he?

25    A    Yes, he has.

1    Q    Let's talk about the GPS monitoring and what I'll call,

2    if I say it wrong fix it for me, please, house arrest.  It's

3    really not house arrest.  It's GPS, but he has to be in his

4    house under --

5    A    Right.

6    Q    -- right?

7    A    Correct.

8    Q    Except for certain permitted times when he can leave.

9    Yes?

10   A    Yes.

11   Q    So Mr. Gibson at one point you said to us expressed

12   frustration about his inability to get employment or all the

13   problems he had or hassles he had to go through in order to

14   get permission to be applied.  Yes?

15   A    Correct.

16   Q    He expressed that frustration.  Did he rant on that

17   particular occasion?

18   A    He's gone and had rants a lot, so potentially.

19   Q    He had lots of rants?

20   A    Yes.

21   Q    Okay.  And -- but nonetheless, he went through the

22   steps that you discussed with him or Miss Bustos discussed

23   with him in order to get permission to be employed by Auto

24   Zone, did he not?

25   A    Yes.  I would say so.

1    Q    Okay.  And, in fact, the other day he was arrested at

2    Auto Zone on this warrant that issued out of Nevada, wasn't

3    he?

4    A    Yes, he was.

5    Q    So he expressed frustration.  He ranted, but he

6    nonetheless did what he was expressing his frustration about,

7    yes?

8    A    Yes.  We were trying to figure out what was going to be

9    required from him so -- that he was to get to us from Auto

10   Zone so that we can make sure that we're following the

11   conditions properly.

12   Q    Good.  And he did those things, right?

13   A    He -- we hadn't yet got to that point where we were

14   going to either make notification to Auto Zone, if there was

15   going to be a requirement for him to use the internet there

16   regarding his charges.  Our condition in Colorado reads that

17   -- that if he is going to be using the internet for

18   employment purposes that they must be given a notice in

19   writing of his charges.

20   Q    So you were working through that process?

21   A    We were trying to work through that process to get it

22   corrected.

23   Q    All right.

24   A    In Las Vegas apparently there was an error about the

25   employment.  It was supposed to have that condition in there.

```
 1    Their condition in Las Vegas is a little bit more strict than

 2    our condition.

 3    Q    I see.  So you were working through that process?

 4    A    Yes, we were.

 5    Q    And part -- and part of that working through is what he

 6    was frustrated about, the steps and the timing it was taking,

 7    yes?

 8    A    Sure.  I would say that all of their requirements of

 9    him for employment and not being able to access the internet

10    to get employment in the first place.  Those -- those type of

11    things.

12    Q    But he was not disobeying your directives?

13    A    Not -- not directly, no.

14    Q    No.  Let's talk about a phone.  At some point wasn't

15    there a conversation about the need for a phone and

16    Mr. Gibson's use of a telephone?  I guess we call them cell

17    phones, right?

18    A    Yes.  Mm-hmm.

19    Q    And did you go through a process of discussing how he

20    would get that approval, if at all, with him?

21    A    In respect to just a personal phone for him or a phone

22    for the employment?

23    Q    Just a phone for employment.

24    A    Okay.  So we had a conversation about if he were to be

25    a delivery truck driver or a delivery driver for parts for
```

1    Auto Zone if they were going to be giving him a phone and

2    potentially if that phone was going to have internet access.

3    Q    And I'm glad you made that point about a personal phone

4    or business phone.  Wasn't there an occasion where Mr. Gibson

5    actually visited with you and provided you with a telephone

6    so that you and your supervisor could see whether it was

7    appropriate for him to have it?

8    A    Yes.

9    Q    And, in fact, that was on the day before Mr. Gibson was

10   arrested, yes?

11   A    Yes.  Yes.

12   Q    He had visited Vince Cobb at the Independence House

13   North as he was supposed to, yes?

14   A    Yes.

15   Q    And that he came to your office with your knowledge,

16   yes?

17   A    Yes.

18   Q    He met with you the day before his arrest again and

19   provided you with a telephone, yes?

20   A    Yes.

21   Q    And that was in order for you and some other person

22   possibly to make sure that it was appropriate for him to have

23   that phone in his possession while on bond in this case, yes?

24   A    Yes.

25   Q    And it was determined by you that that was an

1    appropriate type of telephone for him to have in his

2    possession, was it not?

3    A      Right.  He gave me the telephone and I took it back and

4    we had a discussion with my supervisor, Mr. Murphy.  And we

5    looked at the phone.  It didn't appear to have -- it appeared

6    that it could potentially have internet access, but it didn't

7    have anything set up on it.

8    Q      Was it one of these old-fashioned kind of phones that

9    old people have like me?

10   A      Let's see your phone.

11   Q      Do you want to see it?  All right.  I'm not going to

12   mark it as an exhibit, but I'll ask the Court, counsel for

13   the government to take notice of this old man's phone.

14          THE COURT:  I will stipulate that Mr. Williamson

15   is old-fashioned.

16          MR. WILLIAMSON:  You didn't need to laugh quite

17   that loud, Mr. Morales.  Thank you very much.

18          THE WITNESS:  Well, I can -- I can -- it's on the

19   record.

20   Q      (BY MR. WILLIAMSON) Okay.  So -- so Mr. Gibson came and

21   provided the phone to you.  Had he expressed some frustration

22   about the whole phone thing before this meeting?

23   A      I believe so, yeah, maybe early on.

24   Q      Now, another thing that happened during the course of

25   your supervision of Mr. Gibson while on bond was he was

```
 1    talking with you about permission to -- to go on walks with

 2    his dog.  Yes?

 3    A    Yes.

 4    Q    He has a golden retriever dog, yes?

 5    A    Yes, he does.  Mm-hmm.

 6    Q    What's the dog's name?

 7    A    Bear.

 8              THE DEFENDANT:  Bear.

 9    Q    (BY MR. WILLIAMSON) Bear, right?

10    A    Mm-hmm.

11    Q    Have you met Bear?

12    A    Yes, I have.

13    Q    Did he bite you?

14    A    He didn't bite me.  No.

15    Q    Good.  No.  That's always a good thing.

16    A    That's a little -- yeah, a very friendly dog.  Yeah.

17    Q    The -- eventually -- and Mr. -- and Mr. Gibson and you

18    talked about what steps would have to be gone through in

19    order for him to be given permission to go on walks with the

20    dog, yes?

21    A    Yes.  Well, initially, you know, he wanted to go on

22    walks, but we can't do that --

23    Q    Right.

24    A    -- with the GPS.

25    Q    Right.
```

1    A    So we were going to look to set up times where he can

2    take the dog outside for -- to take it out for the restroom,

3    you know.  It was twice a day for 15 minutes each day --

4    Q    Mm-hmm.

5    A    -- in the morning and the one at night.  And then he --

6    he -- he asked frequently about going to take the dog out for

7    walks during --

8    Q    Was he sometimes frustrated about not being able to

9    take the dog on other walks?

10    A    Yes.

11    Q    But he continued to talk with you about those

12    frustrations --

13    A    Right.

14    Q    -- and what could be done to allow him to have a

15    greater degree of freedom in walking the dog?

16    A    Yeah.  And that's -- that's something that's generally

17    not allowed on the GPS.

18    Q    Right.  Eventually though --

19    A    Right.

20    Q    -- he did get permission, did he not?

21    A    Yes.  We had a conversation on the 26th with all of his

22    supervisors, you know, and then his probation office in Las

23    Vegas and we came up with a possibility of allowing him to

24    take his dog along with his counselor, Stuart, on a walk on a

25    preapproved route and then he would just need to contact me

1     to schedule that and schedule the route and so we can -- so

2     it's not going through any areas that might be of concern

3     regarding his charges.

4     Q     Gotcha.  So eventually there was a process gone through

5     and a conclusion arrived at where Mr. Gibson under these

6     specific restrictions and accompanied by his counselor, life

7     coach Stuart Watkins, could walk his dog, yes --

8     A     Yes.

9     Q     -- even though he'd been frustrated about that process

10    earlier, yes?

11    A     Yes.

12    Q     Now, much has been made here about -- well, maybe not

13    much, but we'll see, about -- talking about suicide?

14    A     Mm-hmm.

15    Q     Now, you have seen the pretrial services report?

16    A     Mm-hmm.

17    Q     Mr. Gibson has no criminal history, right?

18    A     Correct.

19    Q     Nothing in the criminal history report about him

20    actually having attempted suicide in the past?

21    A     I believe there's something in the report saying that

22    he had suicidal identification when he was in Las Vegas.

23    Q     Suicidal ideas about committing suicide?

24    A     Yeah, and that he -- there was some counseling

25    apparently sought I believe.  If I can refer to the one

```
 1    report there's --

 2    Q     It's up to you.  I think you're talking about Page 3

 3    under mental health?

 4    A     Right.  There is -- yeah, there's a paragraph where he

 5    was admitted to a mental health facility due to suicidal

 6    ideation.

 7    Q     Okay.  So that's back before he was even released on

 8    bail in this case?

 9    A     Correct.

10    Q     And that's in the pretrial report that both the

11    Magistrate Judge here in the District of Colorado considered

12    before releasing him, and then later was presumably before a

13    Magistrate Judge in Las Vegas when they I'll call it

14    re-released them on their own conditions, yes?

15    A     Yes.

16    Q     So people were aware that there was this history, if

17    you will, of suicidal ideation --

18    A     Mm-hmm.

19    Q     -- in the past, yes?

20    A     Yes.

21    Q     Okay.  And Mr. Gibson is in counseling now with Vince

22    Cobb, yes?

23    A     Mm-hmm.  Yes.

24    Q     He is on medication, yes?

25    A     Yes.
```

```
 1    Q    He is working with Mr. Watkins privately and

 2    independently, yes?

 3    A    Yes.

 4    Q    He is being seen by a physician, Dr. Wise, who's

 5    prescribing medication for him, yes?

 6    A    Yes.  I believe so.  Yeah.

 7    Q    Well, you know he's on medication?

 8    A    The medication that I'm aware of was prescribed

 9    initially by his physician.

10    Q    Right.

11    A    And I'm not completely sure of all the medications

12    that's been prescribed by Dr. Wise.  Yeah.

13    Q    Understood.  Understood.  In fact, let me talk to you

14    about that if I could.

15    A    Sure.

16    Q    Were you ever made aware of a -- say, within the last

17    month or so change in Mr. Gibson's medication, that is, where

18    lithium was prescribed in addition to the other medications

19    he was taking?

20    A    Mr. Gibson made a comment about that one during our

21    conversation that he had been prescribed lithium.  Yes.

22    Q    And was that a conversation as best you can recall,

23    let's say, within the last month or so?  Give us your best

24    estimate.

25    A    Right.  I would say that sometime in the last -- last
```

```
 1    couple of weeks, yeah, few weeks.

 2    Q    Okay.  Would it have been -- isn't it true it would

 3    have been before this conversation you're talking about on

 4    January 26th and the conversation on February 2nd?

 5    A    I can't say for certain.  Yeah.  Yeah.

 6    Q    It could have been?

 7    A    It could have been.  Yeah.

 8    Q    It could have been a medication change?

 9    A    Yes.

10    Q    Are you familiar at all with the side effects of

11    lithium in some people who are prescribed it?

12    A    I know of lithium being prescribed as a medication for

13    mental health, but I don't know all of the side effects.

14    Q    Are -- so you are aware that one of the potential side

15    effects is increased agitation?

16         MS. PALUCH:  Your Honor, objection.  The witness

17    just testified he's not familiar with the side effects of

18    this medication.

19         THE COURT:  That's true.

20    Q    (BY MR. WILLIAMSON) Okay.  Back to Mr. Gibson and his

21    -- his conditions of supervised release.  There was a

22    conversation also about -- as I read it and (inaudible).

23    Have you had a chance to (inaudible)?  Okay.  All right.

24    There was a conversation about not -- Mr. Gibson said on --

25    let's go specifically to the 2nd now because that's the one
```

1    that's alleged in our petition here.  That he wasn't going to

2    or didn't intend to comply with the conditions of supervised

3    release or, excuse me, of pretrial release --

4    A    Mm-hmm.

5    Q    -- right?  And I believe you told us that he expressed

6    similar frustration in the past about his rights being

7    violated and things of that sort; is that true?

8    A    Yes.

9    Q    But he's complied with the conditions of pretrial

10   release --

11   A    Yes, he has.

12   Q    -- despite expressing these frustrations, yes?

13   A    Yes.

14   Q    Then there was a conversation about whether people were

15   or weren't being threatened.  And that's a part of the

16   conversation on February 2nd, yes?

17   A    Yes.

18   Q    And when asked directly that night, I guess we're going

19   to have a witness on the phone here in a minute, Mr. Gibson

20   said he wasn't threatening, yes?

21   A    Yeah.  I believe he said he wasn't threatening.

22   Q    You have never seen a firearm or a weapon in or around

23   Mr. Gibson during the time you've been involved with him,

24   right?

25   A    No.  I have -- well, since I've been supervising him,

1    no, not out of his house.  Initially when I -- when I did do

2    a home inspection there was a large hunting knife, but it

3    wasn't -- I don't know if that -- you want to consider that

4    as contact with the case or with him, not with him directly,

5    but there was a large hunting knife which could be a weapon I

6    guess in his apartment.

7    Q    But no firearm?

8    A    No firearms.

9    Q    And who -- who's hunting knife was it?

10   A    I don't know if it was his roommate's or his, but it

11   was --

12   Q    All right.

13   A    -- it was in the house.

14   Q    Did he ever pick it up and threaten you with it?

15   A    No, never, no.

16   Q    Did he say during your conversation either on the 26th

17   or February 2nd that he was going to throw a knife at

18   somebody?

19   A    No.  That wasn't -- that had -- that knife wasn't in

20   the house when he was released.

21   Q    Oh.

22   A    It was removed from the -- from the house prior to him

23   being released.

24   Q    Okay.  Thank you for clarifying that.  And you've

25   already established Mr. Gibson has no criminal history at

1    all, correct?

2    A    No, not that I'm aware of.

3    Q    Does that mean there might be, but you just don't know

4    about it?

5    A    Well, not that I -- any information that I have is from

6    the bond report.

7    Q    The pretrial services report which goes through a

8    recently comprehensive check of people's criminal history has

9    indicated that Mr. Gibson does not have any criminal record

10    at all, does it not?

11    A    Correct.

12    Q    Thank you.  Now, you've talked about how you know John

13    Gibson who's here today, his -- my client's father.  Would

14    you say John Gibson, his father, is supportive of his son?

15    A    Yes.

16    Q    Now, you talked about how Mr. Gibson, Andrew, said

17    well, I'm going to slit my neck or throat or something in

18    Court, right?

19    A    Mm-hmm.  Mm-hmm.  Right.

20    Q    I have to step aside for just a moment and comment on

21    the small irony of me having appeared yesterday for someone

22    who actually did have their throat cut, but that was a

23    different set of circumstances.

24    And can you tell me in getting into the federal court

25    in Las Vegas if you know, and maybe Miss Bustos can comment

1 on this, we go through metal detectors, do we not?

2 A We do here.  Yeah.

3 Q Right.  And so how was it that Andrew was going to be

4 able to get a knife into the courtroom?

5    MS. PALUCH:  Objection, Your Honor.

6    THE COURT:  Mr. Williamson, I've got to say that

7 I've had too many prison cases where people have fashioned

8 serious weapons out of almost anything for this line of

9 questioning to have any effect on me whatsoever.

10    MR. WILLIAMSON:  All right.  We'll just move right

11 along.

12    THE COURT:  Okay.

13 Q (BY MR. WILLIAMSON) How many times to your knowledge

14 has Mr. Andrew Gibson actually attempted suicide?

15 A I don't think -- well, I don't think he has.  What's

16 reported in the bond report -- I don't -- to my knowledge I

17 don't know if he has actually attempted suicide.

18 Q So you have no information that he has.  He's talked

19 about it, but as far as you are aware --

20 A Right.

21 Q -- there's no -- not been any actual attempts in this

22 regard?

23 A Actual -- yeah.  Right, any actual attempts that have

24 been documented or -- or have been notified -- made aware of.

25    MR. WILLIAMSON:  If I may just have a moment, Your

1    Honor.

2              THE COURT:  Yes.

3              MR. WILLIAMSON:  Thank you.

4              THE COURT:  What?  Are you talking about the

5    (inaudible) file?

6              MS. PALUCH:  I'm sorry?

7              THE COURT:  You can look at the notes yourself.  I

8    mean, if you'd like (inaudible).

9              MS. PALUCH:  No.  I'm fine.

10             MR. WILLIAMSON:  I apologize.  I was just giving

11   his notes back to him.

12             THE COURT:  Yeah.  But if you want to look at them

13   right now you can look at them.

14             MS. PALUCH:  I'm fine, Your Honor.  I --

15             MR. WILLIAMSON:  Thank you.  I'm sorry.  I

16   shouldn't have overlooked you.  I apologize.

17             MS. PALUCH:  No worries.

18   Q   (BY MR. WILLIAMSON) If I can refer to the notes that

19   you provided to me that are typewritten they appear to relate

20   to the conversation on February 2nd; is that fair?

21   A    Yes.

22   Q    Down in the -- I think the second to the last paragraph

23   there's some comments about the -- about what Mr. Andrew

24   Gibson said --

25   A    Mm-hmm.

```
 1    Q    -- including that he wasn't making a threat, yes?

 2    A    Yes.

 3    Q    And in there it says -- there's a phrase, and I'm

 4    assuming you wrote this, possibly something armed?

 5    A    Possibly something armed.  I don't know what you're

 6    referring to.  Okay.  Okay.  Yeah.  Possibly said armed and

 7    ready, something insinuating.  Yeah.  Yeah.  Yeah.

 8    Q    Your language is he might -- he possibly said that?

 9    A    Yeah.  I mean, that's -- we were -- on the conversation

10    he went onto this rant and kind of caught us off guard by

11    going onto this and he was insinuating those type of things,

12    that he would be --

13    Q    Insinuating.  So that's why you use the word possibly?

14    A    Yeah.  Yeah --

15    Q    All right.

16    A    -- because I couldn't recall exactly the words that he

17    used.

18    Q    All right.  The Court will make a note of that I'm

19    sure.

20         THE COURT:  Well, I will say this, and I haven't

21    heard a thing on this one yet.  In the actual violation

22    notice the words locked and loaded are used in quotes.  Does

23    that appear anywhere on your notes?

24         THE WITNESS:  It does not appear on my notes, Your

25    Honor, because I don't specifically recall those words.
```

1            THE COURT:  Okay.

2            THE WITNESS:  But, you know, there were words I

3    guess in that realm that were -- yeah.

4    Q    (BY MR. WILLIAMSON) In any case, you've never seen a

5    firearm in or around Andrew Gibson?

6    A    No, I have not.

7    Q    And in that same note -- page right after the comment

8    about not threatening or not meaning to threaten or whatever

9    the language was, Mr. Gibson says probation is welcome to

10   come or can come and do routine checks or something like

11   that?

12   A    Yeah.  Yeah.  I mean, yeah.  I haven't had a problem

13   with Mr. -- with Mr. Gibson, going to his residence or

14   anything like that.  No.

15            MR. WILLIAMSON:  I have no further questions.

16            MS. PALUCH:  Your Honor, if I may.

17            THE COURT:  Yeah, Miss Paluch, but I'm going to

18   ask a question or two myself.  Mr. Morales, every set of

19   conditions includes no weapons.

20            THE WITNESS:  Correct.

21            THE COURT:  When you're supervising somebody and

22   you come across credible evidence that they have a weapon

23   what is your protocol?

24            THE WITNESS:  Well, I would first go to staff with

25   that information.  Credible evidence on is there a weapon

1    there at the residence or is there --

2             THE COURT:  Wherever -- wherever your person

3    you're supervising is living, you believe there's credible

4    evidence there's a weapon there, what's your protocol?

5             THE WITNESS:  Well, I would -- I would probably

6    (inaudible) that with my supervisor initially and figure out

7    what the -- what the evidence is that someone is calling to

8    notify us; that if there is a firearm in the residence we

9    could potentially contact other law enforcement to see if

10   there's any information --

11            THE COURT:  No.  I'm -- I want you to assume.

12   This is a hypothetical.  Okay.  I want you to assume there's

13   credible evidence there's a weapon there.  So you actually

14   believe there's a weapon there.

15            THE WITNESS:  Okay.

16            THE COURT:  What is your protocol in your office?

17            THE WITNESS:  Well, we (inaudible) with our

18   supervisor and we'll figure out if we could potentially

19   approach the Court saying that there's very good evidence

20   that there's firearms in the residence.

21            THE COURT:  So you might not come to the Court?

22            THE WITNESS:  No.  We would approach the Court.

23            THE COURT:  No.  No.  But is it your -- is it

24   discretionary for you to do something or not do something

25   under the policies you operate under?

1          THE WITNESS:  So if we know for sure that there is

2     a weapon at this residence we would approach the Court and

3     say there's evidence that there's firearms in this residence

4     indicating that there are -- that there's firearms there for

5     sure and that he will be in direct violation of the condition

6     that he's not to be in possession of firearms.

7          THE COURT:  How quickly would you do that?

8          THE WITNESS:  Fairly quickly.  I would probably

9     type up something that same day.

10          THE COURT:  Do you have authority to actually

11     conduct a search of the house at that time that you believe

12     there's a weapon there?

13          THE WITNESS:  So often when I go to a residence I

14     do a home -- a home inspection.  I go to the house and look

15     in every room, closets, but I'm not searching the house.  If

16     there's not a condition for a search I'm (inaudible) -- kind

17     of plain view items in the house.  If I see something that

18     might look like a weapon or where maybe a weapon may be

19     stored that might be something that I might ask to open, but

20     not -- not a search of the house unless the Court asks us to

21     do a search or there's a condition for searches.  It's

22     different on post conviction from -- from pretrial

23     supervision.

24          THE COURT:  Okay.

25          THE WITNESS:  There may be a specific condition

```
 1    for searches on post conviction.

 2              THE COURT:  Miss Paluch.

 3              MS. PALUCH:  Thank you, Your Honor.  May I

 4    approach the witness and look at the one --

 5              THE COURT:  Oh, yeah.

 6              THE WITNESS:  -- he was asked about on

 7    Cross-Examination?  Okay.  Thank you very much.

 8                   REDIRECT EXAMINATION

 9    BY MS. PALUCH:

10    Q    Officer Morales, you testified about conversations with

11    Mr. Gibson and your concerns for his safety and safety of

12    others; is that correct?

13    A    Yeah.  Yes.

14    Q    Does it affect your opinion in that respect whether or

15    not the defendant had actually attempted suicide?

16    A    No.  I mean, I take comments very serious that if

17    someone is going to commit suicide or possibly do something

18    violent or something like that those comments are obviously

19    very serious.

20    Q    You don't wait for an attempt before --

21    A    Right.  Right.  Yeah.

22    Q    -- you take action such as speaking to his counselor

23    about statements he's made; is that correct?

24    A    Correct.

25              MS. PALUCH:  Thank you very much.  No further
```

1      questions.

2            THE COURT:  Okay.  You can step down.

3            MS. PALUCH:  Your Honor, the office would -- the

4      United States would ask that Officer Bustos be contacted by

5      telephone on conference call.

6            THE CLERK:  (Inaudible).

7            MS. PALUCH:  Yeah.

8            THE CLERK:  So (inaudible).

9            MS. PALUCH:  Right.  So we would just dial her

10     number and we'd take the conference -- do you mind if I

11     assist, Your Honor?

12           THE COURT:  Go ahead.

13           THE CLERK:  I don't have her number.

14           MS. PALUCH:  Oh, no, I have the number to give you

15     (inaudible).

16           MR. WILLIAMSON:  Could we take a short break while

17     we get this set up?

18           THE COURT:  Yes.  Five minutes.  Okay?  Five

19     minutes.

20           THE CLERK:  All rise.  Court is in recess.

21           (Whereupon, a brief recess was taken from 11:20

22     a.m. to 11:36 a.m.)

23           THE COURT:  Please be seated.  We're back on the

24     record in 15-mj-01012.

25           MS. PALUCH:  Thank you, Your Honor.  May I

1     proceed?

2              THE COURT:  Go ahead.

3                   SANDRA BUSTOS, GOVERNMENT WITNESS

4                        DIRECT EXAMINATION

5     BY MS. PALUCH:

6     Q    Miss Bustos, can you hear me?

7     A    Yes, I can.

8     Q    Good morning, ma'am.

9     A    Good morning.

10    Q    How are you employed?

11             MR. WILLIAMSON:  Excuse me.  I hate to be a pain,

12    but aren't we supposed to put the witness under oath or her

13    testimony is not competent?

14             THE COURT:  Yes.  Yes.  Miss Bustos, please state

15    your full name.

16             THE WITNESS:  Sandra Bustos.

17             THE COURT:  Okay.  Where are you at the moment?

18             THE WITNESS:  I am in my office located in Las

19    Vegas, Nevada.

20             THE COURT:  Are you alone?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.  Would you please raise your

23    right hand?

24             THE WITNESS:  Okay.

25             SANDRA BUSTOS, GOVERNMENT'S WITNESS, SWORN

1            THE COURT:  Okay.  Please proceed.

2            MS. PALUCH:  Thank you.

3            THE COURT:  Thank you, Mr. Williamson.

4        SANDRA BUSTOS, GOVERNMENT'S WITNESS, SWORN

5                CONTINUED DIRECT EXAMINATION

6    BY MS. PALUCH:

7    Q    Miss Bustos --

8            MR. WILLIAMSON:  You're welcome, Your Honor.

9    Q    (BY MS. PALUCH) -- Miss Bustos, how are you employed?

10   A    I'm employed at the United States pretrial services

11   office in the District of Nevada, located in Las Vegas.

12   Q    And how long have you held that position?

13   A    18 years.

14   Q    Are you the pretrial services officer assigned to a

15   case in your district in which an Andrew John Gibson is named

16   as a defendant?

17   A    Yes.

18   Q    And is it your understanding Mr. Gibson has been

19   released -- pretrial release on a PR bond?

20   A    Yes.

21   Q    Is it standard in your district that conditions of

22   release are explained to a defendant before he is released on

23   a bond?

24   A    Yes.

25   Q    Okay.  Prior -- prior to February 2nd, last Monday, can

```
 1    you describe for the Court what has been the extent of your

 2    involvement with Mr. Gibson?

 3    A    I met with Mr. Gibson on November 21st, the date that

 4    he was supposed to make his initial appearance in our

 5    district on his charges.  Prior to his hearing he reported to

 6    my office with his father.  I explained to him the

 7    proceedings, what to expect.  We had a lengthy discussion

 8    about himself.  He went to Court.  After Court he reported

 9    back to my office.  We briefly discussed his travel plans.

10    And since then my contact has been over the phone maybe once

11    a month.  The last contact was on February 2nd.

12    Q    Were you involved in a conference call on January 26th

13    regarding Mr. Gibson's case?

14    A    Yes.

15    Q    And do you recall who all was on that conference call?

16    A    The conference call consisted of Mr. Gibson, myself, my

17    supervisor, Erin Oliver, Officer Morales, and his supervisor.

18    Q    And what was the purpose of that conference call on

19    January 26th of this year?

20    A    The purpose of that phone call was to discuss the

21    defendant's release conditions and to answer questions

22    regarding employment, what restrictions were imposed

23    regarding employment.

24    Q    And in -- up until and including that January 26th

25    conversation did you ever have any conversations with the
```

1    defendant present in which the defendant's desire or

2    statements regarding suicide were discussed?

3    A    The very first day that I met with him on November 21st

4    he mentioned prior suicide ideations that he had.

5    Q    Okay.  And did you have subsequent conversations in

6    which suicide was mentioned?

7    A    Not with him directly, no.

8    Q    Okay.  Let's take you to February 2nd.  Did you

9    participate in a conference call on February 2nd regarding

10   the defendant -- or with the defendant?

11   A    Yes.

12   Q    And who was all present on that conference call?

13   A    It was the defendant, Andrew Gibson, myself, and

14   Officer Morales.

15   Q    And what was the purpose of that conference call?

16   A    It was to discuss his possible employment in Auto Zone

17   and to clear up any issues or questions that I had or Officer

18   Morales had regarding his position at Auto Zone.

19   Q    And what were the issues to be discussed regarding that

20   possible employment?

21   A    The one issue was his access to computers at

22   employment, what access he had on the computer.  Was it --

23   would he have access to the internet?  Was it a closed

24   circuit where he can only access Auto Zone related materials?

25   And the other discussion was if he was given a phone was it a

1      Smartphone?  Did it have internet access?

2      Q     And -- and can you describe your understanding of why

3      the internet -- internet access is a concern here or is that

4      a condition of his bond?

5      A     That's a condition of his bond.  One of the conditions

6      of his bond is that he's not to have internet access or

7      access to computers or connecting devices which have internet

8      access.

9      Q     Okay.  And could you please describe that conversation

10     for the Court?  First of all, you've mentioned that you're

11     discussing the possible employment and internet access.

12     A     Correct.

13     Q     How did the conversation progress from that point?

14     A     It was -- we were asking him questions.  What are your

15     responsibilities going to be?  What position?  Is your

16     position going to be -- what -- what is going to be your

17     responsibility?  Mr. Gibson explained that he'd be a driver.

18     He may work the cashier register which is a computer.  That's

19     when we started asking if the computer has access to the

20     internet.  What is the access?  Mr. Gibson said that it was

21     only limited to Auto Zone inventory or the Auto Zone web

22     site; that he did not believe that it had access to the

23     entire internet.  In order to be in accordance with the

24     conditions of release we asked for further information or

25     further details regarding specifically what computer access

1     he's going to have and what his duties would be.

2     Q     Was there any discussion about whether or not he would

3     be needing to use the telephone or -- or a phone through his

4     possible employment?

5     A     Officer Morales had asked him if his employer was going

6     to provide him a phone if he was going to be a driver and I

7     recall Gibson saying yes.  The question was asked then if it

8     would be a Smartphone and what access it would have.  And,

9     again, we proceeded to tell him that we would need a little

10    bit more information.

11    Q     Okay.  And how did Mr. Gibson react to those questions?

12    A     Mr. Gibson at that point became irate, went into a

13    tirade of how he was going to get the job at Auto Zone

14    regardless of what we said.

15    Q     And what else was said, anything in specific?  And I'm

16    going to direct your attention to anything about the

17    conditions of his release.

18    A     He proceeded to state that his life was fine prior to

19    being released on bond and since being placed on bond that we

20    and others have violated his constitutional rights.  He

21    further -- he went on to state that he would have no problem

22    keeping the GPS on his ankle, but that he would not abide by

23    any more conditions as they violate his civil rights.  He

24    continued to make statements that -- of being mistreated in

25    Colorado; that he didn't have -- he's not able to walk his

 1    dog anymore; that he's been locked away in his apartment.  He

 2    went on to make more statements; that he had a previous plan

 3    of suicide and that he should have proceeded with that

 4    because then he wouldn't be in this situation now.  Lastly,

 5    he stated that he would not go to jail and that if anyone

 6    came to violate his constitutional rights that he would be

 7    locked and loaded.  When he made that comment I had asked him

 8    if he just issued a threat in which he replied that he would

 9    just be ready to defend himself against anyone who he

10    perceived to violate his constitutional rights.

11    Q    And what did --

12    A    That --

13    Q    I'm sorry.  Continue.

14    A    No.  At that time -- or soon after the conversation was

15    terminated with Mr. Gibson.

16    Q    Okay.  And once he made those statements and the

17    conversation was terminated what action, if any, did you

18    take?

19    A    At that point I became concerned for Mr. Gibson's

20    safety and for the safety of the community and I contacted

21    our -- our Assistant US Attorney who's assigned to this case,

22    discussed what had occurred and that Assistant US Attorney

23    and I agreed to submit a memorandum to the Court outlining

24    the discussion and requesting that some action be taken.

25    Q    And -- and what was the result of your request?

```
 1    A     We prepared a memorandum for our US Magistrate Judge
 2    Cam Ferenbach and outlined the conversation, and Judge
 3    Ferenbach responded -- I'm sorry.  Let me back up.  The
 4    memorandum contained the information from the conversation.
 5    At the conclusion of the memorandum there's several options
 6    for Court action.  One option is to prepare a warrant for the
 7    defendant's arrest where he shall be ordered to show cause
 8    why his pretrial release should not be revoked.  The second
 9    action is to prepare a summons citing the defendant into
10    Court to appear where he shall be ordered to show cause why
11    his pretrial release should not be revoked.  A third option
12    is no action, and then the fourth option is other.  So when
13    we submitted this memorandum to Judge Ferenbach it had those
14    options and Judge Ferenbach responded stating that he agrees
15    with the action that a warrant be issued for the defendant's
16    arrest.
17    Q     Okay.  And let me just take you back briefly to the
18    conversation.  How certain are you, ma'am, that you heard the
19    terms locked and loaded?
20    A     I am 99.9 percent sure that I heard locked and loaded.
21    Q     Based on that conversation did you perceive what the
22    defendant said as a threat either to himself or to others?
23    A     Yes.
24    Q     Is your answer yes to both of those questions?
25    A     Yes, it is.
```

 1     Q      That was a compound -- okay.

 2     A      Yes to both.

 3            MS. PALUCH:  No further questions, Your Honor.

 4            THE COURT:  Miss Bustos, I have just a question or

 5     two.

 6            MR. WILLIAMSON:  Your Honor, you may want to

 7     introduce yourself so she doesn't --

 8            THE COURT:  Oh, this is the Judge, Michael

 9     Hegarty.  I'm a United States Magistrate Judge.

10            THE WITNESS:  Hi, Your Honor.

11            THE COURT:  Good morning.  The document I have in

12     front of me from your district has boxes that you can check

13     from anywhere from indictment, information, complaint, order

14     of the Court, probation violation petition, supervised

15     release violation petition, and a violation notice.  And the

16     box that's checked is violation notice and I don't understand

17     what that is.  So what's the difference between a violation

18     notice and a supervised release violation petition?

19            THE WITNESS:  Supervised release pertains to those

20     on supervised release and the violation notice pertains to

21     those who are on pretrial release.  In our district, Your

22     Honor, our offices are separated.  So whenever there's a

23     pretrial release violation the box for violation of notice is

24     marked.

25            THE COURT:  Okay.  Who will be doing the

1    questioning for the defense?  Okay.  Mr. Williamson who's

2    counsel for the defendant here will now commence his

3    Cross-Examination if he so chooses.

4              MR. WILLIAMSON:  And I do.  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6    BY MR. WILLIAMSON:

7    Q    Miss Bustos, my name is Warren Williamson and I'm the

8    attorney representing Andrew John Gibson in connection with

9    these proceedings here in the District of Colorado.  I'd like

10   to ask you some questions if I could, please.

11   A    Sure.

12   Q    First, do you have handy or in your presence the order

13   that was entered in the District of Nevada setting the

14   conditions of release in Mr. Gibson's case?

15   A    Yes.

16   Q    And that order was entered November 21, 2014, in the

17   District of Nevada; is that true?

18   A    Correct.

19   Q    And you are familiar with the various conditions that

20   were set forth in the Magistrate Judge's order on

21   November 14th, 2014, are you not?

22   A    Yes.

23   Q    Can you looking through that document point to which of

24   these specific conditions was violated based on your

25   allegations that you made to the Magistrate Judge to get the

1    warrant in this case?

2    A     Pretrial services supervision.

3    Q     So he has -- he has not complied with the conditions of

4    pretrial services supervision?

5    A     I have an individual who has reported that he will no

6    longer abide by the conditions of the Court, and I have an

7    individual who has threatened suicide and who has threatened

8    violence against law enforcement and I take that as a

9    violation of supervision.

10   Q     And in what respect at that point in time when you

11   sought this warrant had Mr. Gibson, in fact, violated the

12   conditions of supervision?

13   A     I'm sorry.  Can you restate that?

14   Q     Yes.  Let me be more specific.  Had Mr. Gibson ever

15   failed to appear in Court as ordered?

16   A     No.

17   Q     Had he ever failed to make any of his appointments with

18   the Court-ordered therapist who is seeing him as part of the

19   conditions of his supervised release?

20   A     That I do not know.

21   Q     Wouldn't you expect that your colleague who's doing the

22   courtesy supervision here, Mr. Morales, would have reported

23   that to you had that occurred?

24   A     We would expect that, but at times we're not notified.

25   Q     I see.  So Mr. Morales might not have told you that

1    Mr. Gibson was not complying with the conditions of

2    supervised release.  Is that your testimony?

3    A     If it was -- if it was something consistent -- if he

4    missed one session I don't expect Officer Morales or any

5    officer to advise me and ask some action be taken.  If it was

6    something more consistent or more egregious then, yes, they

7    would notify me.

8    Q     Were you advised -- do you have any information that

9    Mr. Gibson was not remaining on the prescribed medication?

10    A     No.

11    Q     And, in fact, the conversation on February 2nd, 2015

12    involved, among other things, issues relating to Mr. Gibson's

13    employment at Auto Zone here in Colorado, true?

14    A     It involved his employment at Auto Zone.  Yes.

15    Q     Yes.  Thank you.  And during that conversation is when

16    you said Mr. Gibson became irate and went on a tirade; is

17    that correct?

18    A     Correct.

19    Q     You as a pretrial services officer, did you have access

20    to Mr. Gibson's prior criminal history?

21    A     What's contained in his bail report, yes, I have that

22    information.

23    Q     And he has none; isn't that right?  He has no criminal

24    history?

25    A     Yeah.  I'm looking at his bail report and, no, he does

```
 1    not.

 2    Q     When you went to see your Magistrate Judge following

 3    the February 2nd, 2015, telephone call with Mr. Gibson and

 4    Officer Morales did you explain to the Magistrate Judge that

 5    Mr. Gibson was seeing a mental health professional under the

 6    auspices of the pretrial services agency in Colorado?

 7    A     That theme was specifically not stated in our

 8    memorandum, but it's one of the conditions listed on the

 9    memorandum.

10    Q     So the answer is no, you did not either tell him or

11    remind him of that in applying for the warrant?

12    A     No.

13    Q     Did you explain to him whatever reports or conclusions

14    were coming from that Court-ordered therapist here in the

15    District of Colorado about his meetings with Mr. Gibson?

16    A     No.  Our judge did not request that information.

17    Q     You did not provide it to him; is that correct?

18    A     No.

19    Q     Are you familiar with Asperger's syndrome?

20    A     Yes.

21    Q     One of the symptoms of which is angry outbursts in many

22    people; isn't that true?

23          MS. PALUCH:  Objection, Your Honor.  There's no

24    foundation laid that this witness has any background

25    information on Asperger's.
```

1          THE COURT:  She just said she did.

2          MS. PALUCH:  She just said she knew that --

3          THE COURT:  She's familiar with it so he can test

4    the parameters of her familiarity with it, and if she doesn't

5    know she doesn't know.  I'll overrule the objection.

6    Q     (BY MR. WILLIAMSON) Are you aware that one of the

7    symptoms in people who suffer -- some people who suffer from

8    Asperger's is angry outbursts?

9    A     From what I've read and been told I've -- I've heard --

10   I've heard that that's -- that can be possible with someone

11   who has Asperger's.

12   Q     Now, what evidence do you have either direct or

13   indirect that Mr. Gibson, Andrew Gibson, has or ever has had

14   a firearm?

15   A     I have none.

16   Q     The pretrial report that we've talked about just a

17   moment ago -- the pretrial services report we call it in this

18   district, and I'm not sure if you use the same term in the

19   district of Nevada.  But the pretrial services report has a

20   section entitled Mental Health, does it not?

21   A     Yes.

22   Q     And in that report it mentions that Mr. Gibson talked

23   about suicidal thoughts or suicidal ideation as it's

24   sometimes called; isn't that true?

25   A     Yes.

1   Q    And so that fact was available to the United States

2   Magistrate Judge in the District of Nevada when Mr. Gibson

3   was ordered released on conditions, true?

4   A    Yes.

5   Q    And, in fact, the Magistrate Judge very explicitly

6   directed that a condition of supervised release -- excuse me,

7   pretrial release required the defendant to submit to a mental

8   health evaluation; isn't that right?

9   A    Yes.

10  Q    And that he remain, as we've said earlier, medication

11  compliant, correct?

12  A    Yes.

13  Q    And also he was supposed to test I believe for the use

14  of nonprescribed controlled substances; is that right?

15  A    I'm reviewing his conditions.  If I can just have a

16  moment.

17  Q    Let me help you.  That would be Page 4, six pages in

18  the section captioned Substance Abuse Testing and Treatment?

19  A    Yes.  That's correct.

20  Q    And you received absolutely no indication that

21  Mr. Gibson had ever used a nonprescribed controlled

22  substance, that is in the vernacular had a hot urine; isn't

23  that true?

24  A    That's correct.

25  Q    Or, in fact, that he missed a single one of his

```
1    appointments to provide a urine sample.  You'd received no
2    such information, did you?
3    A    That's correct.
4    Q    Now, back on November 21st of 2014, Mr. Gibson did
5    appear in the District of Nevada on bond as he was ordered to
6    do here in the District of Colorado, did he not?
7    A    Yes.
8    Q    And he was directed to meet with a pretrial services
9    officer and that ended up being you, but he was directed to
10   meet with that person before he went to Court; isn't that
11   right?
12   A    Yes.
13   Q    And he did that?
14   A    Yes.
15         MR. WILLIAMSON:  I have no further questions of
16   this witness.
17         MS. PALUCH:  Nothing further, Your Honor.
18         THE COURT:  I do have a question, Miss Bustos.
19         THE WITNESS:  Yes.
20         THE COURT:  Are you familiar with any associations
21   between Asperger's and a higher risk of suicidal ideation or
22   actually attempts to commit suicide?
23         THE WITNESS:  I'm sorry.  Can you -- can you
24   restate that?
25         THE COURT:  Are you familiar with any association
```

1     of Asperger's syndrome with a higher incidence of either

2     suicidal ideation or attempts to commit suicide?

3              THE WITNESS:  I'm not well-versed on that, Your

4     Honor.  Again, what I read and what is explained to me I'm

5     familiar with, but specific wise I am not very well-versed in

6     that.

7              THE COURT:  Okay.  Thank you.

8              THE WITNESS:  Thank you.

9              THE COURT:  All right.  That's fine.  Miss Paluch,

10    further evidence?

11             MS. PALUCH:  No further evidence, Your Honor.

12             THE COURT:  Okay.  Would you like to put on any

13    evidence?

14             MR. WILLIAMSON:  I would like to make just a few

15    proffers if I could.

16             THE COURT:  Very good.  By the way, I will let you

17    know that while I have been up here I have called up a study

18    and made a recent report stating that suicidal thoughts are

19    10 times more likely in Asperger's adults than -- than the

20    population as a whole.

21             MR. WILLIAMSON:  Thoughts?

22             THE COURT:  Yes.  And 35 percent of people with

23    Asperger's have attempted suicide or thought through how

24    they're going to do it.  That's all.

25             MR. WILLIAMSON:  Thank you.  I appreciate you

1    bringing that to my attention.  I'd like to proffer the

2    following, and that is that John Gibson, my client's father

3    who's here in Court today is fully supportive of his son, is

4    aware of his long-standing mental health issues and has been

5    as a parent over the years involved in various aspects of

6    supervising his son and addressing those mental health issues

7    as they've arisen.  He would also -- I would also proffer

8    that he would advise his son has never had a firearm, has

9    never attempted suicide, but has been difficult and has many

10   difficulties as a consequence of these struggles he's had

11   with mental health issues over the years.

12        Mr. Watkins who is here today who's been described

13   as a life coach, I would proffer that Mr. Watkins has regular

14   contact with the knowledge of the pretrial services agency

15   with Andrew Gibson and is very closely involved with the

16   mental health aspect of his -- of his life-style presently

17   and very, very mindful of the issues that arises as a result

18   of a diagnosis of Asperger's and very closely involved with

19   making certain that Mr. Gibson does what he's supposed to be

20   doing in terms of his treatment and his medication.  He would

21   also advise that Mr. Gibson has never had a firearm and has

22   never actually attempted to harm himself during the time he's

23   been involved with him which is somewhere between one and

24   two years.

25        I don't mean to leave Miss Huff out.  Miss Huff

1    who is my client's stepmother is similarly positioned to bear

2    witness to Mr. Gibson's mental health issues and the way

3    they're addressing them currently and have been in the past.

4           And by way of proffer that's what I have.  When

5    the Court is ready for argument I'm prepared either to go

6    after or before the government however Your Honor sees

7    (inaudible).

8           THE COURT:  Okay.  Did you have any comments or

9    desire to ask any questions of the persons to whom Mr.

10   Williamson referred since they are present in the courtroom?

11          MS. PALUCH:  I do not, but thank you for asking,

12   Your Honor.

13          THE COURT:  Okay.  Yeah.

14          MR. WILLIAMSON:  I'm sorry, Your Honor.  There is

15   one other thing --

16          THE COURT:  Go ahead.

17          MR. WILLIAMSON:  -- I forgot to mention and that

18   is Mr. Gibson, my client's father, has spoken to the --

19   either the manager or the person with authority at Auto Zone.

20   And if the mechanisms are in place for my client to be

21   employed there in compliance with pretrial services he's

22   willing to continue to consider that possibility.

23          THE COURT:  Okay.  Yeah.  I want to disclose some

24   of my thinking so you guys can focus your comments.  But just

25   as an aside, Miss Paluch, Federal Rule of Evidence 612

1    explicitly allows someone like Mr. Williamson to look at

2    those notes.  It's an explicit Federal Rule of Evidence, as

3    does 18 United States Code Section 3500.  In a criminal

4    prosecution once a witness has testified and they have notes

5    those notes are to be made available for Cross-Examination

6    purposes to the other side.

7              MS. PALUCH:  Understood, Your Honor.  I was

8    understanding Mr. Williamson to ask for everything that he

9    had.  I understand that as to those specific conversations,

10   but I -- I did reread the rule and I appreciate that.

11             THE COURT:  Okay.  All right.  So I think it's --

12   I've always viewed it as fair that the parties know what's

13   going on in the particular mind of the judicial officer whose

14   making a decision in any given case.  I think it's right for

15   that judicial officer to disclose sort of the bases of where

16   they're tending if they are tending one way or the other.

17             I think on the actual basis for what we're doing

18   today I would suspect, I haven't researched this, but I would

19   suspect that if during supervision pretrial services becomes

20   aware of information that would lead a reasonable person to

21   believe that the person under supervision is now either a

22   risk of flight or a risk to the community.  Even if it

23   doesn't fit within the neat box of some violation of a

24   specific condition of pretrial release I suspect there's

25   authority to bring that to the attention.  And I'm

1    99.9 percent sure that on my own I would have that authority.

2    I looked over the statute and the statute does address a

3    judicial officer's ability at any time to amend an order that

4    set a person out on conditions, and also in a hearing such as

5    this I inherently have the authority to make an order on

6    whether the evidence before me establishes either a risk to

7    others or a risk (inaudible).  So I don't think there's any

8    jurisdictional or legal impediment to what we're doing,

9    although the alleged violation may not fit within the

10   specific condition that the Court in Nevada set.

11        I have had the experience as a judicial officer of

12   a person making a threat of suicide and it was a mother of

13   two small children down in Colorado Springs.  Husband was

14   away temporarily working on the east coast.  Husband

15   contacted police, worried that his wife was suicidal.  She

16   was committed to a 48-hour hold, 48 or 72, and examined by a

17   psychiatrist.  Convinced the psychiatrist that those were

18   just careless words, was released, and the next day took her

19   own life and the life of her two children.  This was a

20   lawsuit that I handled.

21        It doesn't happen in every case, but it's a life

22   experience that I've had.  So it's fair that you know the

23   life experiences that I'm bringing to the table today.  We

24   have an opinion that I think has been provided to Mr.

25   Williamson and Mr. Johnson out of the District of Utah in

1    which the Court rightfully I believe, and contrary to what I

2    said yesterday on the record in another matter, determined

3    that the law only permits me to consider as far as risks to

4    the community or others risks that are associated with the

5    defendant harming somebody and not himself.  So suicide

6    itself does not fit within the parameters of that statute.

7    And I believe firmly in applying the statute as written,

8    therefor, I wouldn't have authority to find that Mr. Gibson

9    is a risk to others just by his -- solely by his statements

10   concerning suicide so I can't decide the legal basis and I

11   would not.  What the Court did find as a practical matter if

12   there's a risk of suicide, substantial risk of suicide and

13   the person is not available for appearance in future Court

14   proceedings and, therefore, would violate that condition.

15   And the Court used that as a basis for detention that as a

16   practical appeal in the sense, it's a little bit perverse,

17   but it is literally true that if the person commits suicide

18   then their risk of nonappearance -- they won't appear for

19   future Court proceedings.

20          Obviously I'm concerned about the expressed

21   statements that have been put on the record today which I

22   find credible.  To the extent that Mr. Gibson made comments

23   expressing that he wish he had done -- wish he had committed

24   suicide, that he wasn't intending to go to jail; that if that

25   was going to be the ultimate conclusion it's likely that he

1   would commit suicide.  He did make the -- at least veiled, if

2   not specific threats, that if someone came to his home to

3   arrest him that he would -- there would be violence against

4   somebody, either himself or others.  And, you know, spoken by

5   a person who's not being supervised for felony charges in

6   federal court that's serious enough.  Spoken by a person who

7   is being supervised whose currently under indictment it

8   heightens the concern that Mr. Gibson doesn't intend to go to

9   jail.

10          While I have the chance, Mr. Gibson, I do want to

11   tell you something since this is maybe the only time I ever

12   get to speak to you.  Everybody is worth redeeming and you're

13   worth redeeming.  Whatever happens in Nevada is not

14   determinative of who you are or the life you can have.  That

15   you can have a wonderful productive life with your family.

16   You obviously have a father, probably a mother who

17   desperately would want to see you around for the indefinite

18   future.  They would rather die first before you die

19   obviously.  Any parent would say that.  So there's a lot to

20   live for, a lot to live for.  You've been seeing people in

21   this district with the same offense not receive any time

22   whatsoever.  They didn't go to prison.  I don't know what

23   they're doing over in Nevada, but nothing is a done deal at

24   this moment, and so I would just encourage you to have hope

25   in the situation that you're in and allow those people who

 1    love you to speak into your life.

 2          That aside, I am concerned about Mr. Gibson's

 3    statements and whether they could mean that he would take his

 4    own life, and, therefore, technically be within one of the

 5    two considerations I'm lawfully entitled to consider in this

 6    decision.  So -- and I'm not that persuaded by attempts,

 7    actual attempts because if the person is thorough they only

 8    need one actual attempt.  So I'm just -- I'm struggling.  Not

 9    struggling because I believe Mr. Gibson needs to be behind

10    bars because he's a bad person, but struggling because I

11    think he's in a horrible time in his life and perhaps we're

12    not doing enough for him just by leaving him to his own means

13    in his home.  So that's just a little bit about what I'm

14    thinking, but I still have an open mind and I'm willing to be

15    persuaded, Miss Paluch.

16          MS. PALUCH:  Thank you, Your Honor.  And based on

17    the Court's comments I will shorten the argument that I

18    intended to make.  A couple of points.  When we began this

19    proceeding the Court inquired as to whether or not the

20    defendant was entitled to a preliminary hearing and Rule 5.1

21    makes clear that he is not.  He has been indicted.  This is

22    pretrial release.  The only issue is whether or not he should

23    be returned to Nevada in custody, and I think everybody is in

24    agreement that that is the issue that the Court is faced

25    with, whether or not he should be released again on bond.  I

```
1     would point the Court to 18 USC 3142(g)(4) which is cited in

2     the District of Utah opinion which states that the Court is

3     required to consider defendant's mental condition.  And under

4     3142(g)(4) the Court must consider the nature and seriousness

5     of the danger to any person or the community.  And that

6     differs from provision (f) which says any other person.  It

7     says these provisions permit the Court to consider the danger

8     defendant may pose to himself, thus while the statute does

9     not appear to permit the Court to detain a defendant based

10    solely on the risk of suicide, it is nonetheless a factor to

11    be considered.  The Court then goes on to state that the risk

12    of suicide does fall under 3142(f) with regard to a risk of

13    nonappearance.  Here as you've heard the testimony we have

14    the defendant making the statements that he does not want to

15    abide or will not abide by the conditions of his release.  He

16    believes that these conditions are violating his

17    constitutional rights.

18             THE COURT:  But do we have any idea -- I heard the

19    statements several times, but do we have any idea or any

20    evidence in the record?  Is there any evidence in the record

21    about what conditions he believes are unconstitutional?

22             MS. PALUCH:  No, Your Honor.  I just know all we

23    have are statements from the officers which rightfully gave

24    them concern, caused them to reach out to the magistrate

25    which is why we're here today.  I don't believe it's
```

1    necessary that the government prove exactly which condition

2    is -- it -- has been violated.  I think as the Court has

3    pointed out, what is before the Court is has there been a

4    change of circumstances since this defendant was released on

5    pretrial release to cause the Magistrate Judge in Nevada to

6    issue the arrest warrant?  And the answer is yes, and that is

7    the information that the Court received from these two Court

8    officers who were doing their job in reporting to the Court

9    as to the escalation of the defendant's anger towards these

10   conditions that have been imposed on him.  I do believe that

11   there is a risk of safety, of concern for the defendant

12   himself as well as to others in the community.  He has

13   threatened -- made threats to these two Court officials about

14   anybody who would come to his door to arrest him.

15        So we would believe that we have met any burden on

16   both prongs regarding detention, that being a risk of

17   nonappearance as well as safety to the community and to

18   others and for those reasons the government -- we would

19   request that the defendant be remanded to the US -- the

20   custody of the US Marshals and returned to the District of

21   Nevada for further proceedings.  Thank you.

22        THE COURT:  Any time.

23        MR. WILLIAMSON:  Let me start what I think -- with

24   -- start with what I think may be the least important thing

25   here today and that is the legal framework within which we're

1    operating.  Rule 40 of the rules of criminal procedure is the

2    specific rule that addresses why we are here today.  It is

3    captioned arrest for failing to appear in another district or

4    for violating conditions of release set in another district.

5    I would respectfully invite the Court's attention to Rule 40.

6    Rule 40(a) talks about what things are generally to be done,

7    and it says a person must be taken without unnecessary --

8    unnecessary delay before a Magistrate Judge in the district

9    of arrest.  If the person has been arrested under a warrant

10   issued in another district for, then Subsection 1, failing to

11   appear, that's not the case.  Subsection 2, violating

12   conditions of release set in another district.  And I am

13   mindful of Your Honor's general remarks or remarks about its

14   -- your general supervisory authority, but we have absolutely

15   no evidence in this case that Mr. Gibson has violated the

16   conditions of release set in Nevada, not one.

17          THE COURT:  But that is why we're here because

18   they allege it.

19          MR. WILLIAMSON:  They allege it.

20          THE COURT:  So that -- so under Rule 40 we're here

21   in the nature of that hearing and then subparagraph c says

22   the judge may modify any previous release of detention order,

23   right?

24          MR. WILLIAMSON:  You may modify it if you decide

25   to modify it which I certainly wouldn't have.  I'm not going

1    to be arguing it.  If you have some other ideas about

2    conditions that you think are appropriate you certainly have

3    the authority to do that.

4              THE COURT:  Right.

5              MR. WILLIAMSON:  But I think the framework is

6    interesting.  It then takes us to Rule 5C.3 and -- which

7    we're all familiar with of the rules of criminal procedure.

8    But interestingly at least to me there's yet another statute

9    which rears its head and that is 18 USC Section 3148 which is

10   the specific section of the Bail Reform Act which talks about

11   sanctions for violation of release conditions which is

12   essentially you're being asked to hear today to sanction this

13   alleged violation of release conditions by detaining the

14   defendant.  And the reason I look at that sanction is if you

15   look at 3148(b) the very last section of that first paragraph

16   it says essentially that you should revoke if after a hearing

17   you find probable cause to believe the person has committed a

18   federal state or local crime.  There's no evidence of that by

19   clear and convincing evidence that the person has violated

20   any other condition of release.  So that's really the burden

21   today.

22             THE COURT:  But isn't that -- isn't that

23   addressing the ultimate fact finder in Nevada?

24             MR. WILLIAMSON:  Right.  That's addressing --

25             THE COURT:  They're not deciding revocation.  I'm

 1    not -- I don't have the jurisdiction to revoke anything.  I

 2    just have to decide whether he should be transported by the

 3    Marshal Service over to Nevada or whether he should appear

 4    over there voluntarily.

 5         MR. WILLIAMSON:  Yes.  Remember we talked about

 6    Rule 5 and part of Rule 5 requires you to decide whether he

 7    does that in custody or not in custody, on bond or not on

 8    bond.  So the universe that's captured here for purposes of

 9    your legal analysis is one where unless you find by clear and

10    convincing evidence that he's violated the conditions of

11    release, however broad the scope, then it is our position

12    that you'd have to maintain the conditions, but you do have

13    the authority under Rule 40 as we bounce around from place to

14    place if you decide not to detain under the standards set

15    forth here to modify the conditions based on an appropriate

16    finding that those conditions should be modified to address

17    the concerns that are before us today.

18         We've heard a great deal of conversation about --

19    most of which coming from me as unfortunately usually the

20    case about Mr. Gibson's frustration, his anger, and how as

21    government counsel has argued he does not want to abide with

22    the conditions of release, whatever the basis for that is.

23    We have not one shred of evidence in this case that even

24    after expressing on earlier occasions those frustrations that

25    he has failed in any respect to the smallest degree to abide

 1     by a condition set on him.  It is I think important to

 2     remember that the conversation about suicidal ideation,

 3     whatever place it has in these discussions here today, was

 4     one which was noted or that fact was noted in the original

 5     pretrial services report that was here when the Magistrate

 6     Judge at that time set conditions of release which included

 7     mental health condition, and the Magistrate Judge in Nevada

 8     had that before him or her, and, again, mental health

 9     conditions were set.  Every single element and aspect of any

10     mental health condition that was set has been complied with

11     in this case, every one.  Moreover, the family has seen to it

12     that there is additional support of a medical or mental

13     health nature in place through an independent life coach who

14     is there more often than our own.  Vince Cobb is there, even

15     though Mr. Gibson has been to Mr. Cobb whenever he is

16     supposed to be.  There's an M.D. involved in this case who is

17     monitoring his medication and it is a specific condition of

18     pretrial release that Mr. Gibson be medication compliant.

19          On the issue of Mr. Cobb, Mr. Vince Cobb who works

20     under the authority of Independence House, Your Honor, knows

21     from your own experience on the bench in dealing with cases

22     involving pretrial release that if the person under contract,

23     the therapist under contract runs into issues that they feel

24     are -- implicate -- may implicate the conditions of

25     supervision, but as a mental health professional more

 1    importantly if Mr. Cobb in his analysis in working with

 2    Mr. Gibson believed there was a danger of imminent suicidal

 3    action it would be incumbent upon him professionally and also

 4    part of his relationship with pretrial services to bring that

 5    to the attention of the pretrial services agency and thus to

 6    the Court.  We have absolutely no indication that that's been

 7    the case, none whatsoever.  And given the record that's been

 8    developed here I would submit to the Court that were that

 9    true we would have heard about it here today because it would

10    have been important for you to take that into account.  I

11    agree with the Court, although I don't remember the exact --

12    oh, yes, I did.  I wrote it down.  The exact word Your Honor

13    used in talking about how to balance in the scale the danger

14    that an individual person might harm themselves -- and I

15    think your legal analysis is spot on.  The word you used is

16    -- I can -- well, I'll get to the word in a minute.  The

17    point that you were making is if the person kills themselves

18    they won't be around to appear in Court.  And I think the

19    word Your Honor used was that's rather perverse.  And I would

20    have used ghoulish, but nonetheless, the whole idea that you

21    should jail somebody to keep them from harming themselves

22    because if they harm themselves they can't be prosecuted is

23    at best a strange one.  And, in fact, there's another side to

24    that coin that you may have experienced in your career as an

25    appellate lawyer.  If someone dies while a case is pending

1    even if it's on appeal from a criminal conviction the case is

2    dismissed.  So there's another side to that perverse coin.

3    Where that lands in the greater analysis I don't really know.

4    But I really -- I understand concerns here.  I understand why

5    this was brought to the attention of the Magistrate Judge.

6    But what I don't think everybody else understands that you do

7    today is the depth and breadth of the attention that's being

8    paid by the family, by other professionals, and by our own

9    pretrial services agency to the very issues that probably

10   give rise to these outbursts and these statements, none of

11   which have anything to do with the technical conditions of

12   release, but even in that broader context the concern Your

13   Honor expressed which are adequately and reasonably addressed

14   because we need to remember that in the bail context we're

15   talking about reasonable assurance, safety of the community,

16   flight risk.  And what is in place here, and Your Honor may

17   have some additional thoughts, are exactly the kinds of

18   attention that needs to be paid, mindful of the fact mostly,

19   Your Honor, that the Bail Reform Act instructs us that

20   nothing in there is meant to in any way diminish the

21   presumption of innocence.  It is a case where all the

22   elements in place now reasonably assure the safety of the

23   community and reasonably assure that this young man who has

24   shown up when he's been asked to everywhere he's been asked

25   to didn't run away even when the FBI came to see him long

1    before the indictment was returned in this case, would be in

2    Court when he's supposed to, and that no one would be in

3    peril by his presence in the community.  This is not a case

4    as the government seems to exist that he's just sort of

5    running around on his own.  He is on GPS monitoring.  He's

6    complied with that.  He's confined to his home when he isn't

7    given permission to do otherwise.  He can't even walk his dog

8    without prior permission and supervision of that act.  His

9    employment is being carefully supervised, the possibility of

10   that employment.  He is -- come -- he came to pretrial

11   services the day before his arrest because they asked him to

12   turn over the phone that he had to make sure that also

13   complied with conditions.

14          I think the overall picture here, the totality of

15   the circumstances suggest that this young man should remain

16   released on conditions and should this Court, which it has

17   the authority to do under Rule 40 of Rule 5, should direct

18   that he appear in the District of Nevada as he has done

19   before even after we had some awareness of his suicidal

20   thoughts, and then let the Court there have a comprehensive

21   review of whether his conditions should be modified in some

22   additional respect or whether he should be retained.  But

23   under the totality again here this is a case where

24   detention -- and I don't mean in any respect to suggest that

25   this would be what the Court would do, washing our hands of

1    the situation and leaving it to somebody else is appropriate

2    because we are here because we have the jurisdiction and

3    authority to be here to address this problem.

4         THE COURT:  No.  I very much feel the burden

5    that's on my shoulders at the moment and I'm carrying that

6    voluntarily.

7         Let me address one more thought to you because

8    it's fair that you address this thought in my mind.  I

9    understand your totality argument.  I also believe that

10   everyone has a breaking point.  Many crimes are committed

11   after a person has gone beyond their breaking point,

12   previously had not acted out thoughts (inaudible) it might

13   have happened, but something happens and that's it.

14        In the current case we have the February 2nd

15   conversation which reasonably can be construed as discussing

16   new restrictions on his ability to hold a job, maybe even

17   having to get into discussions with his actual supervisors

18   about the charges, what he can and cannot have access to at

19   Auto Zone.  So now although he's complied with everything up

20   to that point he feels like the government has just simply

21   gone too far and is taking away his freedom beyond the point

22   he's willing to accept so he makes the statements that he

23   makes.  Since February 2nd he has had no opportunity to

24   comply with conditions because a warrant was issued -- a

25   request for a warrant was issued on the 3rd and was signed on

1    the 4th.  So there hasn't been a course of conduct since what

2    might have been.  We'll never know maybe, but what could be

3    viewed as Mr. Gibson having reached his breaking point and

4    expressed his true thoughts and intentions to two different

5    US Probation Officers.  So I understand the totality

6    argument, but I also believe that there may be here something

7    that renders it a little bit moot.  So why don't you address

8    that?

9            MR. WILLIAMSON:  I would -- I will do my best.

10   First of all, jailing someone for their own good because you

11   want to guarantee that they won't reach the breaking point is

12   essentially preventative detention which is offensive to the

13   concept of bail and concept of presumption of innocence.  But

14   moreover, the Bail Reform Act does not talk about guarantees.

15   It talks about reasonable assurances.  And the question then

16   becomes do the conditions that are imposed or as modified by

17   Your Honor reasonably assure us?  There's -- they -- we can

18   certainly guarantee that everybody shows up in Court in the

19   District of Colorado by just detaining everybody.  We're

20   perilously close to that in many respects, but that's a sure

21   bang way to make sure everybody shows up, but that's not what

22   bail and the Constitution provide.

23           THE COURT:  Well, actually this case disputes that

24   theory.  The US Probation Office requested detention in this

25   very case.

1          MR. WILLIAMSON:  Mm-hmm.

2          THE COURT:  I suspect the US Attorney's Office

3    did, too --

4          MR. WILLIAMSON:  Mm-hmm.

5          THE COURT:  -- and the United States Magistrate

6    Judge who decided that did not.

7          MR. WILLIAMSON:  Exactly.

8          THE COURT:  He agreed with (inaudible).

9          MR. WILLIAMSON:  Your point is exactly correct.

10   That in this case a Magistrate Judge sitting in judgment of

11   this case decided.  And knowing in the pretrial services

12   report we had some indication of, among many other things, a

13   mental health issue, that there were conditions or a

14   combination of conditions that would reasonably assure

15   Mr. Gibson's appearance in Court and the safety of the

16   community.  That's the (inaudible), not guarantee.  We can

17   certainly guarantee all kinds of things by jailing people.

18         The other thing is that Your Honor has talked

19   about the post February 2nd period if I can use that term.

20   In fact, Mr. Gibson did after February 2nd continue to comply

21   with the conditions of supervised release.  Remember, he went

22   to his therapist.

23         THE COURT:  What day was that?

24         MR. WILLIAMSON:  That was the day before his

25   arrest.

 1                    THE COURT:  Which is what day?

 2                    MR. WILLIAMSON:  I'd have to double-check.

 3                    THE DEFENDANT:  Thursday.

 4                    MR. WILLIAMSON:  Well, Thursday doesn't help us.

 5     We need a calendar.  Thank you, Mr. --

 6                    THE COURT:  Thursday was the 5th of February.

 7                    MR. WILLIAMSON:  He was arrested on the 6th.

 8                    THE COURT:  Okay.

 9                    MR. WILLIAMSON:  All right.  We developed that on

10     the record.  He went to his therapist, Vince Cobb, as

11     directed.  He then came to the probation office as directed

12     on February 5th after that meeting and handed over his

13     cellular telephone to Mr. Morales so it could be checked for

14     him.  He was asked to do that and he did do that.  So there's

15     two specific acts of compliance.

16                    The other thing the Court talked about on the

17     tipping point or breaking point is the whole employment

18     thing.  My -- my perspective on that is slightly different

19     from the Court's.  What's been happening is since the very

20     beginning of this release process is -- not continuously, but

21     with some degree of regularity there have been conversations

22     between Mr. Gibson and pretrial services about the

23     circumstances under which he could be employed.  And where we

24     are right now is in the process of working through that.

25     Now, it may end up that the conditions can't be put in place

 1          that pretrial services feels comfortable with.  But we know

 2          the conversation on February 2nd to a large extent involved

 3          the protocol of allowing employment at Auto Zone.  You know,

 4          what kinds of computers did they have?  What access will he

 5          have?  Will he have a Smartphone, etcetera?  All of that was

 6          still part of the conversation.  So even though Mr. Gibson

 7          may have been frustrated at its pace or its measure of

 8          detail, he was not being told no you can't go to work

 9          anywhere.  And, in fact, we know in the past with a couple of

10          other issues, notably the dog walking.  And I don't mean to

11          make fun of that.  I have a very strong feeling for the

12          therapeutic elements of working with and around animals.  And

13          he worked through that and pretrial services eventually

14          accommodated him reasonably.  It's still restricted, but he

15          lived with that restriction.  So that the employment

16          situation that is an organic one at this moment may or may

17          not result in him being allowed to work at Auto Zone or

18          someplace else.  We don't know the answer to that, Number 1.

19          And Number 2, we have some history that Mr. Gibson, although

20          expressing frustration, sticks with it and does what he's

21          supposed to do even though he may not like it much.  And the

22          whole thing about I'm not going to comply with the conditions

23          of release, I think we have to counterbalance that.  Although

24          that's a statement of future intent, it was a statement made

25          among perhaps other times.  But the one I'm aware of on

1    February 2nd, and yet as we've just pointed out the history

2    is that even after February 2nd he was continuing to comply

3    with those conditions of supervised release that were imposed

4    on him that he said he wasn't going to comply with.  It's

5    complicated.  I don't envy you, your position right now.

6              THE COURT:  Do I have a third option by any

7    chance?

8              MR. WILLIAMSON:  Yeah, you do, but I'm not sure we

9    are thinking of the same third option.

10             THE COURT:  My third option --

11             MR. WILLIAMSON:  Is this like no peek poker where

12   I hold a card up and you hold a card up?

13             THE COURT:  That's not the word -- that's not the

14   word we called it, but we probably used a politically

15   incorrect word for that kind of game.

16             MR. WILLIAMSON:  Yes.

17             THE COURT:  I feel like in a sense I'm being asked

18   to be a mental health professional at the moment in part to

19   know exactly what the odds are that he would do some of these

20   things he stated that he would do.  Do I have any authority

21   to have a psychiatric examination performed?

22             MR. WILLIAMSON:  And I'd have to ask Mr. Johnson

23   because for some reason or another he tends to dwell in that

24   world, not personally, but as a lawyer.  I note 4241, but

25   that doesn't really apply here because that --

1          THE COURT:  That's a commitment.

2          MR. WILLIAMSON:  Well, no, 4241 is actually

3    competence to proceed.  And I don't really think that's an

4    issue here.  I would be -- it would not be candid of me to

5    suggest that it was just because it's maybe an easy out.  I

6    do have an idea that may address what your -- what your

7    concern is and that is perhaps we could seek some input from

8    this Vince Cobb who is the mental health professional who's

9    involved with Mr. Gibson's therapy to get his sense or

10   analysis because I'm assuming people have complied with the

11   Court order to do a mental health evaluation.  It's in the

12   bail orders.  So if it hasn't been done you certainly have

13   the authority to direct Independence House to conduct such an

14   evaluation, but they're already treating him and doing an

15   analysis.  You'll note in the bail conditions in the Nevada

16   bail order there was a check-off of something of that sort.

17   I don't seem to have that in front of me.

18         THE COURT:  Well, yeah.  I mean, the defendant

19   shall undergo medical or psychiatric treatment and defendant

20   shall submit to a mental health evaluation as directed by

21   pretrial services or the supervising officer.  Has that --

22   has he submitted to a mental health evaluation?

23         MR. JOHNSON:  It has been done, one done by

24   Independence House.

25         MR. WILLIAMSON:  See?

1          THE COURT:  And do I have a -- is there a report

2     that was generated as part of that?

3          MR. JOHNSON:  There is a report.  I think the

4     report was continued in December I believe.  I can -- I can

5     (inaudible).

6          THE COURT:  All right.  But do I have authority?

7     Is anybody aware of authority I might have to order a

8     supplemental psychiatric evaluation at this time before

9     making the detention decision because as we've seen in the

10    last couple days he's not likely to be over in Nevada in the

11    next couple weeks.  Go ahead.

12         MS. PALUCH:  If I can address Mr. Johnson, I had

13    this issue on a Rule 5.  And the only way that that was

14    accomplished was because of concerns regarding the

15    defendant's competency.  He was sent out for a competency as

16    to whether or not that defendant could participate in the

17    hearings that defendant was entitled to under Rule 5.  So to

18    answer your question he's already been evaluated.  Mental

19    health counseling is a part of his pretrial -- pretrial

20    release conditions.  For the Court to send him out which we

21    -- Mr. Johnson and I found ended up with the defendant being

22    sent to another state.  It was a couple month protracted long

23    proceeding to get an evaluation done.  It was based on mental

24    competency.

25         MR. WILLIAMSON:  Mm-hmm.  Mm-hmm.

```
 1              MS. PALUCH:  I'm not hearing the Court as saying

 2      that you're concerned about competency, but, rather, you're

 3      concerned about mental health treatment.  And it's the

 4      government's position it's already been ordered.  It's

 5      already a condition.  He's already receiving that.  And that

 6      is an issue that should be addressed I believe in Nevada as

 7      to the extent of whether they should modify that condition

 8      and provide him with more treatment to more specifically

 9      address the issues that the defendant is facing.

10              MR. WILLIAMSON:  The short answer is I think your

11      ability to order an evaluation is -- is probably limited.

12      But I do think -- you know, I don't know what's in there

13      speaking of no peeky poker.  The -- I do think it would

14      probably be helpful if Your Honor were provided with a mental

15      health evaluation that's already been done pursuant to the

16      order of the Court in Nevada.  I haven't seen it so I don't

17      know what its components are.

18              THE COURT:  You don't have any objection to me

19      considering that as part of this decision?

20              MR. WILLIAMSON:  No, as long as I get to see it.

21              THE COURT:  Miss Paluch?

22              MS. PALUCH:  No, Your Honor, but I guess we're

23      back to the issue of -- I think the main issue before this

24      Court is can this defendant be released?  We are eight days

25      out, eight days out from the alarming statements that he
```

1    made.  The issue before this Court is can you reasonably

2    assure the safety of others, the safety of this defendant?

3    He -- there is a warrant for him out of Nevada.  The issue is

4    can you come up with conditions that will assure the safety

5    and we are only eight days out from these alarming statements

6    being made.

7              THE COURT:  Right.  And he wasn't arrested until

8    four days out from those statements.

9              MS. PALUCH:  Well, it took -- the very --

10             THE COURT:  The request for the arrest warrant

11   wasn't issued until one day after that by the probation

12   officer.  It wasn't decided until two days after that.

13   That's why I inquired of Mr. Morales, what do you do if you

14   think a person has a gun?  You as the government or

15   Mr. Morales did not believe he had a gun and was going to

16   carry any of that out.

17             MS. PALUCH:  Okay.

18             THE COURT:  They -- they did not believe that at

19   the moment.  They did not take that as a credible threat of

20   actual gun violence.  So I believe that if Mr. Morales had

21   actually believed that there would have been officers at that

22   house that day in force to deal with it.  So I understand

23   we're eight days out, but -- but our system didn't even get

24   involved until four days out.

25             MS. PALUCH:  That's where I disagree, Your Honor,

1    because the actual day of the conversation is the day that

2    Officer Bustos contacted -- sent the memorandum to the

3    prosecutor and to the judge, that day.

4              THE COURT:  No.  She -- well, she sent it on the

5    3rd.

6              MS. PALUCH:  Yeah.  I have a copy of --

7              THE COURT:  The day of the conversation was the

8    2nd.  And I even asked Mr. Morales what time was the

9    conversation and he said it was 1:44 p.m.

10             MS. PALUCH:  Mm-hmm.

11             THE COURT:  She didn't sign her document until the

12   3rd if you'll note on --

13             MS. PALUCH:  If I can approach the Court, this is

14   the matter that's -- this is what was sent by Miss Bustos to

15   the District Court Judge on February 2nd.

16             THE COURT:  Well, what -- then I might be

17   mistaken, but what I have --

18             MS. PALUCH:  An internal memo was sent to the

19   Court after the conversation occurred, the day of.

20             THE COURT:  Okay.  Could I see that?

21             MS. PALUCH:  Yes.  And I've asked Miss Bustos if

22   it was something that I could provide.  She said it's an

23   internal memo from probation to the Court so I don't have a

24   copy for defense counsel.

25             MR. WILLIAMSON:  Under the due process clause I

1    think I'm entitled to look at it if the Court is going to

2    consider it.

3              THE COURT:  Go ahead.  Let him see it first.

4              MR. WILLIAMSON:  Thank you.

5              THE COURT:  But I -- the record that I have shows

6    that Miss Bustos signed her request for a warrant on the 3rd

7    of February and it was signed on the 4th.  That's the very

8    last page of the packet from Nevada that's entitled Warrant

9    for Arrest.

10             MS. PALUCH:  And I guess I would say that -- that

11   this is expeditious, Your Honor.  And whether or not they did

12   not send a law enforcement officer to his house that day I

13   don't believe detracts from the fact that we have an

14   individual who's made these threats and the issue is, again,

15   his safety as well as the safety of those around him to

16   include most primarily law enforcement if they were to go to

17   his house.

18             THE COURT:  Well, if I -- if I were to find that

19   his statements made on February 2nd were mere puffery and he

20   had no intention -- if I believe that, what am I to do?

21             MS. PALUCH:  But I don't believe that's the

22   decision for this Court.  I think the decision --

23             THE COURT:  No, no, no.  I have -- I have to

24   detain.  I have to detain or not detain.  So if I believe he

25   was only letting off steam, if I really believe that and he

1    has no intention of doing anything other than complying with

2    all reasonable conditions of the Court what am I to do?

3              MS. PALUCH:  If you -- if that is your belief then

4    I believe your order would be that he's not detained.

5              THE COURT:  Exactly.  But I need help in making

6    that decision.  And if there's a psychological report out

7    there that says -- I don't know what it says, but it might

8    say it's his style to make these over-the-top contentions and

9    had no intention -- had no intention of following through.

10   It might say that --

11             MS. PALUCH:  It might --

12             THE COURT:  -- and if it does that is a mental

13   health professional ordered by the Court to conduct an

14   examination.  Now, did the Court order a mental health

15   evaluation if it -- the Court did not intend for it -- that

16   evaluation to assist in any way in any judicial proceeding?

17             MS. PALUCH:  Certainly, Your Honor.  But back --

18   back to the issue before about the Court releasing him on

19   bond originally, that was before these threats were made.

20   That was before these specific threats were made, and so --

21             THE COURT:  These specific threats, but not before

22   there was evidence in the record that he had suicidal

23   ideation, agreed?

24             MS. PALUCH:  Right.  Agreed.  So we could be at

25   what the Court described as the breaking point.  He gets to

1      the breaking point.  All of these restrictions are being

2      made.  One of the statements he made is his life was fine

3      until he got released on bond and had to be subjected to all

4      of these conditions.  So, you know, it's like we're --

5              THE COURT:  Well, he could be at that point, but

6      my standard is not could be.

7              MS. PALUCH:  Exactly.

8              THE COURT:  It's not a could be standard.

9              MS. PALUCH:  But -- but --

10             THE COURT:  And the pretrial services report I

11     have under which the previous Magistrate Judge here and the

12     judge over in Nevada released this person says he was

13     admitted to a mental health facility due to suicidal

14     ideation.  So it wasn't just him making idle comments.  It

15     was so serious that either he self-admitted or committed to a

16     mental health facility.  Now, if that mental health facility

17     in Nevada determined that he was suicidal there would have

18     been proceedings.  There weren't.  So they must have

19     determined necessarily that they were not -- they were not

20     serious threats.  But I don't know.  I'm a little bit in the

21     dark here.  And if there's anything out there that might help

22     me, and in the meantime Mr. Gibson remains detained because I

23     haven't made my decision yet, then shouldn't I look at it?

24             MS. PALUCH:  Certainly, Your Honor.  But what I

25     would himself submit to the Court is we're engaging in this

1    exercise of do we really think he meant it?  Do we really

2    think he's going to harm himself or someone else?  And that

3    is -- the stakes are just too high.

4            THE COURT:  I understand that the ultimate stakes

5    are very high.  If I release him and he did something whose

6    shoulder is that on?

7            MS. PALUCH:  I think it's on all of us.

8            THE COURT:  No.  It's on mine.

9            MS. PALUCH:  I know.  I -- I don't dispute that.

10           THE COURT:  You're making your argument for

11   detention.  Mr. Williamson is doing what his client wants him

12   to which he has to do unless he believes it's not in good

13   faith and he doesn't.  So it would be on my shoulders.  And

14   those things keep judges awake at night.  So it couldn't be

15   more serious in my belief system.  And you know a little bit

16   about my belief system and what I believe about a person's

17   actions and what consequences they may have in the distant,

18   distant future, and so I take it very seriously.

19           MS. PALUCH:  And I know you do, Your Honor, and

20   everyone in this courtroom knows you and appreciates that.

21   But I think that's where the case law that I provided to the

22   Court where the District Court in Utah said we have to

23   consider and we're entitled to consider and 3142(g)(4) says

24   that the Court must consider the dangerousness to any person.

25   And so I -- my argument is we have to err on the side of

1     keeping everyone safe.

2             THE COURT:  Did you read about the facts though in

3     that case, about what that defendant actually did that

4     resulted in his -- in his indictment?

5             MS. PALUCH:  I did, Your Honor.  I do -- I

6     still --

7             THE COURT:  Okay.  That's a little more -- in our

8     -- in our non-trained limited human understanding that's a

9     little more worthy of wanting to take your life having done

10    what that person did than here.

11            MS. PALUCH:  Exactly, but -- I do agree with that,

12    Your Honor, but at the same time when -- you've heard from

13    two Court personnel, one of which has said that the defendant

14    would be locked and loaded if anyone came to his home to

15    arrest him.  Another is saying that they perceived what the

16    defendant was saying was a threat to others as well as a

17    threat to himself.  To me it's a straightforward -- it is a

18    detention case.  I feel like the government and the Court has

19    to err on the side of keeping everyone safe, and if that

20    means he goes back to Nevada courtesy of the US Marshal to

21    raise every argument as to why he is no longer a threat to

22    anyone; why he has now seen that it wasn't smart to make

23    those kinds of statements to his Court personnel while he was

24    under indictment and has a trial date of April 13th.  This is

25    a case I absolutely believe is clear that the defendant

 1      should go back in custody.

 2              THE COURT:  Well, and I understand completely your

 3      point, but we are dealing with the ultimate constitutional

 4      right that millions of Americans have died for and that's

 5      liberty.  We -- that is the ultimate right.  Without liberty

 6      there -- any other right is meaningless without liberty.  So

 7      we're dealing with his liberty interest, Number 1.  And we're

 8      dealing with the sacred presumption of innocence, Number 2.

 9      So there is no presumption of detention previously to today

10      and I don't think necessarily one has arisen today, although

11      I'm not sure about that.

12              MS. PALUCH:  Actually, Your Honor, there is a

13      rebuttable presumption of detention based on the nature of

14      his underlying offense that still places the burden on the

15      government.  And I can give you the statute for that.  It's

16      3142 --

17              THE COURT:  No, no.  I understand the rebuttable

18      presumption on the child pornography charge.

19              MS. PALUCH:  Exactly.

20              THE COURT:  But -- but that was overcome here

21      which it rarely is.  And I know that our own probation office

22      as a matter of routine requests detention in every case of

23      this nature because of something that happened on the East

24      Coast within the last couple years.  So it's just the way

25      they operate.  And despite that presumption and despite the

1    arguments of both the US Attorney's Office again and the

2    probation office, he's been released by two different

3    magistrate judges.  But that's all beside the point.  I think

4    there's no rush here that I'm aware of.  Again, he won't be

5    going there this week no matter what I say.  So I would like

6    to look at that report and have it submitted in chambers

7    today.  And I'd like to get it in chambers by 2:00 o'clock.

8    I'll issue a written opinion today.

9              MR. WILLIAMSON:  Sorry for interrupting, but I

10   have this secret document from the probation department dated

11   February 2nd, 2015, to Judge Ferenbach which I have looked at

12   so if you'd like me to approach.

13             THE COURT:  I'd like to see it, please.

14             MR. WILLIAMSON:  I don't know when it got in the

15   hands of the Magistrate Judge.  I don't know exact -- the

16   Magistrate Judge (inaudible).  No.  It's Judge Ferenbach

17   who's the Magistrate Judge.  I stand corrected.

18             MS. PALUCH:  If you -- did you see the last page

19   of that, Your Honor, where the options are given to the -- to

20   the judge on that?

21             THE COURT:  Yes.  And Mr. Williamson in your

22   presence advised me yesterday that whatever the judge over in

23   another district says as far as their desire concerning

24   detention or specifically detention is not determinative.

25   But I see that.  Okay.  Can I hold onto this or is this

```
 1    somebody's --

 2               MR. WILLIAMSON:  That's up to government's

 3    counsel.  I have no objection to that.

 4               MS. PALUCH:  No objection, Your Honor.

 5               MR. WILLIAMSON:  It's secret, though, so be

 6    careful.

 7               MS. PALUCH:  Yeah.  That's what they tell me,

 8    so --

 9               THE COURT:  Yeah.  You'd think they would have put

10    some kind of heading on that says confidential or privileged

11    or something, but they didn't, or even internal.

12               MS. PALUCH:  I was informed she submitted it to

13    them under seal.

14               THE COURT:  Yeah.  Yeah, and even under seal.  I

15    mean, it's a good practice at least to have that on the cover

16    page.

17               MS. PALUCH:  Mm-hmm.

18               THE COURT:  I would like -- Carlos, how soon can I

19    get that?

20               THE WITNESS:  (Inaudible).

21               THE COURT:  All right.  That would be fine.

22               MR. WILLIAMSON:  Your Honor, since the Court is

23    considering that document I believe I'd be entitled to see a

24    copy of it.  I can return it at the close of the proceedings,

25    whatever your decision, but --
```

1           THE COURT:  You know what?  I'm going to play it

2      safe.  Carlos is going to go get it now and he'll be back in

3      five minutes.  He'll run it by both of you and then if you

4      had anything to put on the record before it comes to me you

5      may do so.

6           MR. WILLIAMSON:  Got it.

7           THE COURT:  But if you don't he'll just bring it

8      back to chambers.

9           MR. WILLIAMSON:  Perfect.  Sounds good.

10          THE COURT:  Yeah.  So anything further, Miss

11     Paluch?

12          MS. PALUCH:  No.  Thank you, Your Honor.

13          THE COURT:  Mr. Williamson?

14          MR. WILLIAMSON:  Sore.  No.  Thank you.

15          THE COURT:  Again, I don't know if I'll see you

16     face-to-face again, Mr. Gibson, but -- and I don't know if

17     you'll ever remember any of the words I say, but I sincerely

18     hope that you view your life as precious, okay, because it

19     is.

20          We'll be in recess.

21          THE CLERK:  All rise.  Court's in recess.

22

23          (Whereupon, the within hearing was then in

24     conclusion at 12:57 p.m.)

25           I certify that the foregoing is a correct

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

1    transcript, to the best of my knowledge and believe (pursuant

2    to the quality of the recording) from the record of

3    proceedings in the above-entitled matter.

4

5

6

7        /s/ Laurel Tubbs                 March 4, 2015

8    Signature of Transcriber                 Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305

1                        I N D E X

                                              PAGE
2     CARLOS MORALES
      Direct Examination by Ms. Paluch            5
3     Cross-Examination by Mr. Williamson        21
      Redirect Examination by Ms. Paluch         52
4
      SANDRA BUSTOS
5     Direct Examination by Ms. Paluch           55
      Cross-Examination by Mr. Williamson        63

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305